**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

**EDMUND DI LISCIA**
845 Monterey Road
South Pasadena, CA 91030

**LEANDROS KATSAREAS,**
707 Hollywood Ave,
Suffolk, VA 23434

**DOMINQUE BRAGGS,**
109 Water Way, Unit 14
Hampton, VA 23666

**MOHAMMED SHOYEB,**
USS Chancellorsville (CG 62)

*Plaintiffs,*

v.

**LLOYD JAMES AUSTIN III,**
in his official capacity as Secretary of the United States Department of Defense,
1000 Defense Pentagon
Washington, DC 20301

**UNITED STATES DEPARTMENT OF DEFENSE,**
1400 Defense Pentagon
Washington, DC 20301

**THOMAS HARKER,**
in his official capacity as Acting Secretary of the United States Navy,
Naval Litigation Office
720 Kennon St., SE, Room 233
Washington, DC 20374-5013

**VICE ADMIRAL JOHN B. NOWELL, JR.,**
in his official capacity as Chief of Naval Personnel and Deputy Chief of Naval Operations,
Naval Litigation Office
720 Kennon St., SE, Room 233

Civil Action No. 21-1047

**COMPLAINT**
(Jury Requested)

Washington, DC 20374-5013

**UNITED STATES DEPARTMENT OF THE NAVY,**
Naval Litigation Office
720 Kennon St., SE, Room 233
Washington, DC 20374-5013

**CAPTAIN ERIC J. ANDUZE,**
in his official capacity as Commanding Officer, USS Theodore Roosevelt
Naval Litigation Office
720 Kennon St., SE, Room 233
Washington, DC 20374-5013

*Defendants*.

Eric S. Baxter (D.C. Bar No. 479221)
Daniel Blomberg (D.C. Bar No. 1032624)
Diana M. Verm (D.C. Bar No. 1811222)
Diana M. Verm (D.C. Bar No. 1811222)
Kayla Toney (D.C. Bar No. 1644219)
*(admission pending)*
The Becket Fund for Religious Liberty
1919 Pennsylvania Ave. NW, Suite 400
Washington, DC, 20006
(202) 955-0095 PHONE
(202) 955-0090 FAX
*ebaxter@becketlaw.org*

Amandeep S. Sidhu (D.C. Bar No. 978142)
Winston & Strawn LLP
1901 L St., NW
Washington, DC, 20036-3506
(202) 282-5828 PHONE
(202) 282-5100 FAX
asidhu@winston.com

*Counsel for Plaintiffs*

## NATURE OF THE ACTION

1. Plaintiff Edmund Di Liscia, a devout Chassidic Jew and a Sailor in the United States Navy with a rating as an Electricians Mate, Nuclear Power 3rd Class Petty Officer (EMN3), seeks emergency relief to stop Defendants from forcing him to shave in violation of his sincerely held religious beliefs.

2. Over two years ago, shortly after joining the Navy, EMN3 Di Liscia received a "no-shave chit" permitting him to maintain his beard as a religious accommodation for his faith. That accommodation remained effective during his current deployment aboard the U.S.S. Theodore Roosevelt. Indeed, throughout the deployment, his fellow Sailors aboard the USS Roosevelt have all received MWR (Morale, Welfare, and Recreation) no-shave chits that allow them to shave only once every fourteen days.

3. But on or around April 14, 2021, EMN3 Di Liscia's chief informed him that he must shave on the morning of April 16, 2021, and regularly thereafter. Shortly before 5 AM ET on April 15, EMN3 Di Liscia was given a Record of Counseling memorializing that he has been given a direct order to shave and will be in violation of the order and will face punishment if he does not shave "prior to quarters 16APR2021" at his current location, which would be approximately 4:30 today (April 15) eastern time. If he does not shave, he will be subject to disciplinary action, which would permanently damage his career in the Navy and may subject him to severe personal penalties.

4. Defendants' threats against EMN3 Di Liscia violate federal constitutional and statutory law, and must be immediately enjoined.

5. The remaining Plaintiffs are also Sailors in the United States Navy. They are all devout adherents of Islam and are also obliged by their faith to maintain a substantial beard.

6. Two already have beards. Plaintiff Leandros Katsareas, a Mass Communication Specialist 3rd Class Petty Officer ("MC3") has had a religious accommodation for a quarter-inch beard since October 2018, and an accommodation for a four-inch beard since July 2020. Plaintiff Dominque Braggs, an Aviation Boatswain's Mate—Fuels 3rd Class Petty Officer ("ABF3") has had a beard for medical reasons ever since completing boot camp because he suffers from *pseudofolliculitis barbae* or "razor bumps"—a condition that overwhelmingly affects African-American Sailors like Braggs. Even with this medical accommodation, however, he is required to shave every thirty days to prove he still gets painful swellings on his face each time he does.

7. The fourth Plaintiff, Mohammed Shoyeb, an Operations Specialist 2nd Class Petty Officer (OS2), has sought a religious accommodation to grow a beard but been denied.

8. At any given time there are thousands of Sailors with beards for medical reasons. And ship commanders have broad discretion to allow Sailors to grow beards as a morale booster—a common practice, particularly on long deployments at sea. Indeed, the Navy has a robust tradition of bearded sailors; until 1985, beards were a defining feature of Navy servicemen.

9. Yet Defendants have recently started insisting there can be *no* religious-beard accommodations for Sailors on sea duty, because a beard supposedly "reduces safe and effective wear and operation of protective equipment," specifically gas masks and respirators.

10. The issue has now come to a head. Plaintiff Di Liscia is suddenly being coerced to shave immediately, even though no new risk to health or safety has been identified. Similarly, MC3 Katsareas—who is currently working as a legal clerk, on a ship docked for repairs—has been told that his religious accommodation is about to be rescinded. ABF3 Braggs has recently filed for an official religious accommodation, but his application is still pending and—based on the Navy's response to other requests for accommodation—likely to be denied or granted only to the extent

he remains on shore duty. In the meantime, he has regularly been pressured to undergo electrolysis or laser hair removal on his face so that his existing medical accommodation can be voided. And OS2 Shoyeb's appeal from the denial of his request for a religious accommodation has been categorically denied.

11. For all Plaintiffs, being prevented from wearing a substantial beard is a severe violation of their religious beliefs, yet under the Navy's grooming policies, they are subject to harsh penalties—and potential dishonorable discharge—for maintaining this religious practice.

12. Defendants should know that their disregard of Plaintiffs' religious obligations is unlawful. In this context, the First Amendment's Free Exercise Clause and the Religious Freedom Restoration Act of 1993 ("RFRA") both forbid Defendants from burdening Sailors' sincere religious exercise absent a compelling governmental interest that cannot be met by some means less restrictive than forced shaves. *See Tandon v. v. Newsom,* No. 20A151, 2021 WL 1328507 (Apr. 9, 2021); U.S. Const. amend. I; 42 U.S.C. § 2000bb, *et seq*. And regulations of the Department of Defense and Navy each separately impose the same obligation. Dep't of Defense Instruction 1300.17 ¶ 1.2(e) (as updated September 1, 2020) (hereinafter "Defense Instr.") § 1.2(e); Bureau of Navy Personnel Instruction 1730.11A ¶ 3 (as updated March 16, 2020) (hereinafter "Navy Instr.").

13. Defendants cannot possibly demonstrate a compelling governmental interest in requiring Plaintiffs to shave when they allow beards for a variety of other reasons, and have done so for decades. The fact that the U.S. Army and Air Force both allow religious beards further belies any supposedly compelling reason Defendants may assert for suppressing Plaintiffs' religious exercise. And the allowance for religious beards by militaries around the world, including in the United

Kingdom, Canada, Israel, Australia, New Zealand, and India, as well as by police and fire departments throughout the U.S., further undermines Defendants' claims.

14. Nor can Defendants show that forced shaves are the least restrictive means of resolving their alleged concerns. Even if beards didn't work with standard-issue masks, Defendants cannot show there are no other options that would. *See Singh v. McHugh*, 185 F. Supp. 3d 201, 231 n.23 (D.D.C. 2016) (noting that the Army has admitted there are masks "capable of providing protection to individuals who wear beards"). And Defendants bear the burden to show that the approach taken by other branches of the military, by militaries worldwide, and by police and fire departments across the nation is not viable.

15. Defendants' own decades-long policies and practices prove that they have no compelling interest in forcing Plaintiffs to shave now. They should thus immediately be enjoined—at least long enough for Plaintiffs' claims to be heard on their full merits.

## JURISDICTION AND VENUE

16. The Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1361.

17. Venue lies in this district pursuant to 28 U.S.C. § 1391(e)(1).

## IDENTIFICATION OF PARTIES

18. Plaintiff EMN3 Edmund Di Liscia is a devout Chassidic Jew and a Member of the United States Navy stationed aboard the USS Theodore Roosevelt (CVN 71), currently deployed at sea.

19. Plaintiff MC3 Leandros Katsareas is a practicing Muslim and a member of the United States Navy stationed aboard the USS George Washington (CVN 73), currently docked in Newport News, Virginia.

20. Plaintiff ABF3 Dominque Braggs, is a practicing Muslim and a member of the United States Navy stationed at Naval Station Norfolk in Norfolk, Virginia.

21. Plaintiff OS2 Mohammed Shoyeb is a practicing Muslim and a member of the United States Navy stationed aboard the USS Chancellorsville (CG 62), which is currently docked in Yokosuka, Japan.

22. Defendants are appointed officials of the United States government and United States governmental agencies responsible for the United States military and its grooming policies.

23. Defendant Lloyd James Austin III is the Secretary of the United States Department of Defense. In this capacity, he has responsibility for the operation and management of the armed forces. Secretary Austin is sued in his official capacity only.

24. Defendant United States Department of Defense is an executive agency of the United States government and is responsible for the maintenance of the United States military.

25. Defendant Thomas Harker is the Acting Secretary of the United States Navy and is responsible for the operation and management of the United States Navy. Acting Secretary Harker is sued in his official capacity only.

26. Defendant Vice Admiral John B. Nowell, Jr. is the Chief of Naval Personnel and Deputy Chief of Naval Operations (Manpower, Personnel, Training and Education). In this capacity, he has responsibility for religious accommodations in the Navy. Vice Admiral Nowell is sued in his official capacity only.

27. Defendant Department of the Navy is a department of the United States military and is responsible for the promulgation and administration of its own grooming policies and regulations.

28. Defendant Captain Eric J. Anduze is the Commanding Officer of the USS Theodore Roosevelt. In this capacity, he is responsible for EMN3 Di Liscia. Captain Anduze is sued in his official capacity only.

## FACTUAL ALLEGATIONS

EMN3 Di Liscia's Orthodox Jewish Beliefs

29. EMN3 Di Liscia is a devout Chassidic Jew. He became observant prior to joining the Navy and has continued to practice the religion throughout his service.

30. Orthodox Judaism places great emphasis on observing ancient laws and customs spelled out in the Torah, the Talmud, and the Shulchan Aruch (Code of Jewish Law). Traditional Jewish laws and customs regulate everything from maintaining a kosher diet, to faithfully observing a day of rest on the Sabbath, to personal grooming habits regarding beards.

31. Chassidic Judaism, in particular, encourages adherents to engage in open piety and observance of their faith in everyday life.[1] This faith tradition is steeped in religious commitments regarding holiness, and Chassidic Jews such as EMN3 Di Liscia strive to keep even the hidden meaning of the Torah which is not explicitly stated in the text.

32. The Torah directs, "Do not cut off the hair on the sides of your head. Do not shave off the edges of your beard." Leviticus 19:27.[2] Various adherents of Orthodox Judaism, including Chassidic Jews, understand this passage to restrict or forbid the shaving of facial hair.[3] According to the leading medieval commentator on the Hebrew Bible, "as a practical matter, since the exact areas of these edges are not clearly defined, it is forbidden to shave the entire beard….[T]he Torah forbids one to *destroy* it and to *shave it*."[4]

---

1 Randal F. Schnoor, *Tradition and Innovation in an Ultra-Orthodox Community: The Hasidim of Outremont*, 10 Can. Jewish Studies 54 (2002), https://perma.cc/7NWP-4GT4.

2 The Living Torah, trans. Rabbi Aryeh Kaplan, https://perma.cc/QE5G-M7Z5.

3 *See* Deborah Pergament, *It's Not Just Hair: Historical and Cultural Considerations for an Emerging Technology*, 75 Chi.-Kent L. Rev. 41, 47 (1999) (discussing the Orthodox Jewish understanding of the passage and accompanying Talmudic injunctions).

4 Rabbi Shlomo Yitzchaki, Commentary on Leviticus 19:27, Artscroll Stone Edition of the Torah, at 664 (known as Rashi, this eleventh-century scholar is the primary commentator on the Torah and Talmud).

33. Many Chassidic Jews believe the beard is so holy that they do not even trim it with scissors.[5] According to the Code of Jewish Law, "[t]here are five corners of the beard, and there are many opinions on them, therefore a God-fearing man should fulfill all of them and not pass a razor over any of his beard at all."[6] Because their sincere belief is that they must do God's will in the best way possible, and because the definition of "edges" and "corners" is unclear, Chassidic Jews refrain from shaving at all to avoid the possibility of breaking God's commandment.[7] They also refrain from destroying the corners of their sideburns, which is a practice unique to Chassidic Judaism.

34. Adherents to Chassidic Judaism have maintained a strong tradition of wearing beards.[8] They believe that *growing* a beard, not just refraining from shaving it, is an inherently good and holy action. For Chassidic Jews, wearing a beard is not only an expression of fidelity and spiritual modesty, but also a sign of maturity. Their sincerely held religious beliefs thus compel them to serve God in the holiest way possible.

The Muslim Sailors' Religious Beliefs

35. Islam, typically translated as "submission to God," is an Abrahamic religion that upholds belief in a single God. Muslims believe that God has revealed Islam through four sources of truth:

a. The Qur'an, which is God's word as revealed to the prophet Muhammad;

b. Tradition, which includes the sayings of Muhammad as recorded in the Hadith and other holy texts;

---

5 Shulchan Aruch, Yoreh De'ah 181-3, https://perma.cc/TUX8-47UC ("And there are those who forbid scissors that shave like a razor; and their words should be regarded.")

6 Shulchan Aruch, Yoreh De'ah 181-11, https://perma.cc/TYY9-E62N.

7 *See* Makkot 20a, the William Davison Talmud, https://perma.cc/3NP5-39KW ("And one is liable for marring the edges of his beard only if he removes the hair with a razor. Rabbi Eliezer says: Even if he removed the hair with tweezers…he is liable to receive lashes.")

8 Elliott Horowitz, *Beards*, Yivo Encyclopedia of the Jews in E. Eur., https://perma.cc/S9NW-6WZU.

c. Consensus of Muslim scholars; and

d. Intellect.[9]

36. Worldwide, there are approximately 1.8 billion Muslims. Approximately 3.5 million Muslims live in the United States. As of 2015, at least 5,800 self-identified Muslims serve in the U.S. military, with more than 1,000 in the Navy. Because many Muslims prefer to "stay below the radar and just do their jobs without having to defend Islam," particularly since the War on Terror involves enemy co-religionists, a more accurate estimate may be between 10,000 and 15,000.[10]

37. The practice of Islam is based on "Five Pillars," obligatory acts of worship:

a. *Shahada*: to declare belief in God and that Muhammad is his final prophet and messenger;

b. *Salat*: to pray five times daily;

c. *Zakat*: to give charity;

d. *Sawm*: to fast during Ramadan; and,

e. *Hajj*: to make a pilgrimage to Mecca at least once in a Muslim's life.

38. *Fitra*, translated as "original disposition" or "primordial nature," is the state of purity in which Muslims believe that all humans were born. Muslims believe that the appearance of the beard was a "specific miraculous event."[11] According to the Stories of the Prophets, the angel Gabriel told the first man, Adam, that his beard was a blessing from Allah, given "in response to

---

[9] Allamah Murtada Baghdadi, *The Islamic Perspective of the Beard* (trans. Shaykh Mubashir Ali, Shaykh Muhammad Amin), https://perma.cc/CHC8-S58D.

[10] Shareda Hosein, *Muslims in the U.S. Military: Moral Injury and Eroding Rights*, Pastoral Psychology (2019) 68: 77-92, https://doi.org/10.1007/s11089-018-0839-8.

[11] Baghdadi, *The Islamic Perspective of the Beard*, https://perma.cc/CHC8-S58D.

the supplication you made to your Lord," "granted to you and your male offspring till the day of reckoning."[12]

39. According to the Quran, it is a sin to "alter Allah's creation," and Muslims believe that "shaving of the beard is…an unnatural alteration with regard to what Allah, the Exalted, has created naturally."[13] Muslim tradition further explains that the beard was created to provide a "clear distinction between the male and the female offspring of Adam."[14]

40. Muslims follow several ritual purity practices regarding personal grooming. *See* Sunan Abu Dawud, MSA Reference: Book I, Hadith 0052 (Narrated by Aisha, Ummul Mu'minin) ("The Apostle of Allah […] said: 'Ten are the acts according to *fitrah* (nature): clipping the moustache, letting the beard grow, ….'"); *see also* Sahih Al-Bukhari, MSA Reference: Vol. 7, Book 72, Hadith 781 (Narrated by Ibn 'Umar) ("Allah's Messenger […] said 'Cut the moustaches short and leave the beard (as it is).'").

41. In Islamic jurisprudence, Muslims are exhorted to be neat and clean because according to the Prophet Muhammad, "Verily, Allah is Beautiful and He loves Beauty." Sahih Muslim, MSA Reference: Book I, Hadith 164 (Narrated by Abdullah b. Mas'ud). Thus, Muslim holy texts refer to the beard as a sign of devotion to God as well as masculinity.

42. In accord with these and other teachings, major Islamic schools of jurisprudence consider it obligatory for males to have a beard. Shaving is "considered an unjust action" and "regarded a sin by which an individual may be considered worthy of being punished."[15]

---

[12] *Id.*

[13] *Id.*

[14] *Id.*

[15] Baghdadi, *The Islamic Perspective of the Beard*, https://perma.cc/CHC8-S58D.

MC3 Katsareas's Commitment to the Islamic Faith

43. MC3 Katsareas converted to Islam in 2001 at the age of sixteen and has faithfully observed its tenets ever since, despite significant discrimination in both Australia and the U.S. When studying different religions before his conversion, MC3 Katsareas was specifically drawn to the principles of justice and free will inherent in Islam, principles which also motivated him to move to the United States. He has several years of experience as a civilian prison and hospital chaplain and as a lay religious leader in his community.

44. For virtually his entire adult life prior to shipping out to Navy Recruit Training Command at the age of 31, he maintained a beard in accordance with his sincere religious beliefs. His sincerely held belief and practice is that his beard should be at a minimum of fist length, or four inches below the chin and neatly groomed and trimmed, with the edges lined up. MC3 Katsareas considers it sinful and spiritually degrading not to maintain a fist-length beard that complies with his religious obligations.

45. MC3 Katsareas currently maintains a beard, which he views both as a symbol of devotion to God and as a defining feature of his masculinity. He believes wearing a beard helps him set a good example for his family and for other Muslims, and that if forced to compromise in this area, it will undermine his legacy in other aspects of his faith as well as harming his relationship with God.

ABF3 Braggs's Commitment to the Islamic Faith

46. After living in accordance with the Islamic faith since 2017, ABF3 Braggs formally converted to Islam with the assistance of Navy Chaplain Abuhena Saifulislam in 2020. He daily observes the tenets of the faith by studying the Quran, praying five times a day, and abstaining from alcohol. He also observes Islam's various fasts.

47. His sincerely held belief and practice is that his beard should be at a minimum of fist length, or four inches below the chin, but is not required to be longer than a fist in length.

48. ABF3 Braggs considers it sinful and spiritually degrading not to maintain a fist-length beard that complies with his religious obligations.

49. His sincerely held belief and practice is that his beard should be groomed and trimmed neatly, with the edges lined up.

OS2 Shoyeb's Commitment to the Islamic Faith

50. OS2 Shoyeb was born and raised in the Islamic faith, attending his local mosque throughout his childhood and teenage years. Prior to joining the Navy, he had never shaved.

51. OS2 Shoyeb has faithfully observed his faith's tenets his entire adult life.

52. Throughout his time in the Navy, OS2 Shoyeb has continued to practice his faith to the fullest extent possible. He studies the Quran, prays five times a day, tries to maintain a *halal* diet, and fasts regularly.

53. In accord with his beliefs, OS2 Shoyeb believes that as a devout Muslim man he should wear a fist-length beard.

54. Initially unaware that he could seek a religious accommodation OS2 Shoyeb does not presently wear a beard. If not for his military service, OS2 Shoyeb would wear a beard in conformity with his religious beliefs.

55. His sincerely held belief and practice is that his beard should be at a minimum of fist length, or four inches below the chin, but is not required to be longer than a fist in length. His sincerely held belief and practice is that his beard should be groomed and trimmed neatly, with the edges lined up.

56. OS2 Shoyeb considers it sinful and spiritually degrading not to maintain a fist-length beard that complies with his religious obligations.

Unique Challenges for Muslim Sailors

57. Since the terrorist attacks on September 11, 2001, serving in the U.S. military has become more difficult for Muslims, so much so that many feel compelled to keep their faith hidden "to avoid being harassed by peers."[16] This pressure to either keep their religious identity secret or serve as "apologists for the actions of extremist groups whose members call themselves Muslim but whom most Muslims in America see as enemies of their religion" places additional strain on Muslim servicemembers' mental health and wellbeing.[17]

58. "Despite the heightened sense of suspicion over the entire Muslim American community in the United States, some young Muslims are still inspired to join the military."[18] MC3 Katsareas and OS2 Shoyeb have both expressed that the September 11, 2001 terrorist attacks motivated them to join the U.S. military, both to fight terrorism and to counteract stereotypes of Islamic extremism. Muslim Sailors like MC3 Katsareas, OS2 Shoyeb, and ABF3 Braggs should be lauded for choosing to fight for freedom despite the additional challenges they face as Muslim servicemembers. They should not have to face the additional burden of having to choose between their service and their faith.

59. In the aftermath of the 2009 Fort Hood shooting by an Islamic extremist, many Muslim servicemembers "felt that they had to singlehandedly defend Islam and American Muslims from the negative backlash as they built bridges of understanding with people of all faiths so that

---

16 Hosein, *Muslims in the U.S. Military: Moral Injury and Eroding Rights*, https://doi.org/10.1007/s11089-018-0839-8.

17 *Id.*

18 *Id.*

Muslims wouldn't be lumped into the same category of terrorists."[19] In his statement in response to the Fort Hood shooting, General George Casey stated that "the military benefits from diversity…and as horrific as this tragedy was, if our diversity becomes a casualty, I think that's worse."[20]

60. Based on these events in recent U.S. history, and research documenting the unique pressures that Muslim servicemembers face, the ability to freely express their faith by wearing beards would directly strengthen the mental health and identity of MC3 Katsareas, OS2 Shoyeb, ABF3 Braggs, and other similarly-situated Sailors. Without religious accommodations, these Sailors "pay a higher price psychologically due to not being able to freely declare their full identity, perhaps in terms of religious struggles generated by not being able to publicly integrate their religious faith into their military service."[21]

61. Granting religious beard accommodations would also boost morale and foster diversity, which U.S. military leaders have recognized as a strength, and it would contribute to good order and discipline rather than detracting from those interests. Indeed, "studies suggest that people who practice their religion have higher levels of wellbeing."[22]

62. Allowing beards for religious reasons would also expand recruitment opportunities to more diverse communities who may otherwise be unable or unlikely to serve, including African Americans, Sikhs, and Orthodox Jewish communities.

[19] *Id.*

[20] *Id.*

[21] Hosein, *Muslims in the U.S. Military: Moral Injury and Eroding Rights*, https://doi.org/10.1007/s11089-018-0839-8.

[22] *Id.*

EMN3 Di Liscia's Military Service

63. EMN3 Di Liscia serves as an Electrician's Mate, Nuclear Power. His duties can include operating, maintaining, and repairing generators, motors, and other electrical equipment associated with the nuclear power reactor.

64. He is currently serving aboard the USS Theodore Roosevelt (CVN 71), which is deployed at sea.

EMN3 Di Liscia's Efforts to Obtain an Accommodation

65. As an observant Jew, EMN3 Di Liscia came to boot camp with a full beard. He immediately sought to speak with a chaplain to obtain an accommodation for his beard. But he was told that if he pursued speaking with a chaplain about the matter, he would be immediately kicked out of the Navy. Out of fear, he shaved.

66. EMN3 Di Liscia regretted that decision and, about five months later, sought and received a no-shave chit, a religious accommodation allowing him to keep his beard. EMN3 Di Liscia obtained the no-shave chit around December 2018, while he was assigned to shore command. The chit transferred over to sea duty with him for his current deployment. He has not shaved since being granted the no-shave chit.

67. On his current deployment, EMN3 Di Liscia's commander has also issued a ship-wide MWR (Morale, Welfare, and Recration) no-shave chit to help boost morale on the long sea deployment. However, this chit too would be insufficient to protect EMN3 Di Liscia as Sailors still must clean-shave every fourteen days.

68. In accordance with his Orthodox Jewish faith, EMN3 Di Liscia believes that, as a devout Jew, he should maintain his beard uncut by a razor blade.

69. Thus, to comply with his faith's prescriptions, on September 8, 2020, EMN3 Di Liscia sought a durable religious accommodation that would provide more long-term protection than his current no-shave chit.

70. On December 21, 2020, his request for a religious accommodation was denied by the Deputy Chief of Naval Operations (DCNO) on the stated grounds of safety concerns and possible interference with the effective performance of his duties, particularly in the event that he might have to wear a sealed gas mask or similar equipment. *See* Exhibit A ([Di Liscia Denial Letter] (Dec. 21, 2020)).

71. In late March and early April 2021, he filed an appeal of the DCNO's decision to the Chief of Naval Operations. The appeal was filed pursuant to Defense Instr. 1300.17 and Navy Instr. 1730.11A and is still pending.

72. EMN3 Di Liscia is safely able to serve in his position while maintaining a beard.

73. In his role as an EMN3, he assists with maintaining electrical equipment within the ship's reactor plant. He also stands watch on control stations and take intakes and logs. He does not perform work where it is common or likely that the use of face masks (including gas masks, self-contained breathing apparatus face masks and respirators) could be affected by a beard.

74. Like every EMN, he is trained to fight fires within the plants. While wearing a beard, he has undergone and passed routine gas-mask-seal-integrity tests, and his beard did not interfere with obtaining a satisfactory seal. Moreover, neither he nor fellow Sailors with him were required to undergo a full-chamber test because, as indicated by the first-class petty officer overseeing the seal-integrity test, the Damage Control department was not concerned about their ability to safely don a mask in the event of damage control.

75. Indeed, even the DCNO's letter denying his accommodation has already acknowledged that "the probability of a negative consequence from an ineffective seal is relatively low."

76. In his entire service as an EMN3, EMN3 Di Liscia has never had to don a gas mask as part of his usual duties.

77. EMN3 Di Liscia now brings this claim to enforce his rights under the First Amendment to the United States Constitution and RFRA.

MC3 Katsareas's Military Service

78. MC3 Katsareas was born and raised in Australia. After seeing the atrocities carried out by terrorists who claimed to act in the name of Islam on September 11, 2001, he vowed to fight against terrorists and their ideology.

79. In 2006, he was living in New Zealand and was invited to attend an Officer Selection Board to commission as an officer in the New Zealand Army. He did not proceed, as he could not bring himself to swear an inviolable oath to the Queen of England, both because of his faith and as a matter of personal conviction.

80. While later studying a course of Arabic at Qatar University, classmates from the United States who recognized MC3 Katsareas's passion for liberty encouraged him to study the Declaration of Independence, the Founding Fathers, and the Constitution. After thoroughly studying the principles behind the founding of the United States, he vowed that he would immigrate, become a U.S. citizen, and spend his life honorably serving and defending the United States Constitution.

81. MC3 Katsareas arrived in the United States in 2012 and, from 2013 to 2016, worked successfully with the FBI to help identify terrorist threats against Americans and U.S. interests both at home and abroad. His work led to the apprehension, expulsion, trials, and convictions of

several would-be terrorists in the United States and abroad. Within one day of obtaining his Permanent Residence in 2014, he filled out an application to join the Navy and was honored to swear an oath to support and defend the Constitution of the United States.

82. Soon after becoming a naturalized citizen at Navy Recruit Training Command in 2016, MC3 Katsareas renounced his Australian citizenship, as he considered it dishonorable to keep the benefits that come with citizenship when he was not willing to fight for that country's system of government.

83. Within two months of finishing Boot Camp at Recruit Training Command, MC3 Katsareas was deployed to 5th Fleet aboard USS Nitze (DDG 94) as a Professional Apprenticeship Career Track Seaman, where he often volunteered his Arabic skills to stand watches on the bridge, especially during many transits through the straits of Bab el-Mandeb and Hormuz.

84. In 2019, after graduating from the Defense Information School, MC3 Katsareas was stationed aboard the USS George Washington (CVN 73), an aircraft carrier docked in Newport News since August 2017 for a four-year Refueling and Complex Overhaul.

85. MC3 Katsareas has faced significant discrimination as a Muslim servicemember. In addition to the pressures of enemy combat externally, he has also experienced internal pressure from his own shipmates due to his faith.

<u>MC3 Katsareas's Efforts to Obtain an Accommodation</u>

86. Based on 2014 revisions to Department of Defense Instruction 1300.17 regarding religious accommodations, which he reviewed before joining the Navy, MC3 Katsareas expected that his sincerely held religious beliefs would be respected and accommodated.

87. Thus, after swearing his oath of enlistment, but before reporting to Recruit Training Command, MC3 Katsareas sought assurance that his sincerely held religious beliefs could be

accommodated, submitting a formal request for a beard accommodation to his recruiter. The recruiter said that it would not be possible to have a beard during training and that he would have to make the request at his first operational command.

88. Given no other options, in order to join the Navy in service of his country, MC3 Katsareas made the excruciating decision to shave his beard the night before going to boot camp. This was a very emotional experience that affected his sense of identity, his relationship with God, and his marriage. It felt like cutting out a piece of his own heart.

89. After training, he made repeated requests for a religious accommodation to allow him to maintain a beard in accordance with his faith.

90. Navy Sailors may often, during sea underway evolutions and deployments, purchase no-shave "chits" that allow the Sailor to grow a beard, with proceeds going to the Navy's Morale, Welfare and Recreation Program. Though MC3 Katsareas was able to obtain such a chit on the USS Nitze in 2016, which lasted during his six-month deployment, he was still forced to shave when docked at the port of Nice, France, during his deployment. He received no formal religious accommodation until 2018.

91. In 2018, after nearly two years of his requests being misrouted, mishandled, and delayed, and while serving at Naval Station Norfolk, he submitted his fifth religious accommodation request for a waiver of grooming standards for religious purposes. He received a religious accommodation for an ungroomed quarter-inch beard while he was at the Defense Information School. *See* Exhibit B (Memorandum from R.P. Burke to Seaman Leandros Katsareas (Oct. 9, 2018)).

92. This accommodation only "partially approved" MC3 Katsareas's request, which was for a fist-length beard. *Id.* ¶ 1. According to the accommodation, MC3 Katsareas could maintain his quarter-inch beard "while performing non-operational duties, including non-operational training,

while attached to Naval Station Norfolk." *Id.* ¶ 3. He was told that "[u]pon a change in mission, duty or environment, and with a compelling government interest, your Commanding Officer may request that you temporarily shave your beard." *Id.* ¶ 3. He was further told "you must again request approval when you report to a new command." *Id.*

93. On December 6, 2019, MC3 Katsareas again submitted a request for a full religious accommodation, including:

a. a fist-length beard from the bottom of the chin, which can be rolled and tied to achieve a length of two inches;

b. a beard with edges that are groomed so as to be neat and clean, per the requirements of his sincerely held religious beliefs; and,

c. a mustache that is neat and blends well into the beard.

94. A few months later, on March 16, 2020, the Bureau of Naval Personnel issued an updated Instruction regarding religious accommodations in the Navy, emphasizing that "commanders will provide maximum opportunity for the free exercise of religion by members of the naval service." Navy Instr. 1730.11A ¶ 5. The instruction specifically contemplates accommodations of the type MC3 Katsareas requested. *Id.* ¶ 5(d)(4)(c).

95. Per Navy policy, MC3 Katsareas was interviewed by a Navy chaplain, Commander Abuhena Sailfulislam, who submitted a memorandum regarding his request. *See* Exhibit C (Memorandum from Commander Abuhena Saifulislam to Commanding Officer, USS George Washington (Dec. 20, 2019)).Commander Saifulislam explained that MC3 "Katsareas has been a Muslim for almost 19 years after converting to Islam at the age of 16" and that his "beliefs stem from sources found in Islamic jurisprudence and are consistently recognized in all Islamic schools of jurisprudence." *Id.* ¶ 3. Commander Saifulislam stated that his "professional and objective

opinion is that the approval of this request is of paramount religious importance to" MC3 Katsareas. *Id.*

96. Nonetheless, on April 4, 2020, the Deputy Chief of Naval Operations denied MC3 Katsareas's request for an accommodation. *See* Exhibit D (Memorandum from John B. Nowell, Jr. to MC3 Leandros Katsareas (Apr. 4, 2020)).

97. Pursuant to Navy policy, on May 5, 2020, MC3 Katsareas submitted an appeal to the Chief of Naval Operations. *See* Exhibit E.

98. While MC3 Katsareas's appeal was pending, he was reassigned from the media department to the Auxiliary Security Force (ASF) on board the USS George Washington.

99. Based on this reassignment, on July 15, 2020, the Deputy Chief of Naval Operations (DCNO) reconsidered the prior denial because these "present duties" with the ASF made "it highly unlikely that [MC3 Katsareas] be required to don personal protective equipment." *See* Exhibit F.

100. The letter from the DCNO specified that "[u]pon a change in mission, duty, or work environment, and in furtherance of a compelling government interest" MC3 Katsareas could be "required to shave [his] beard in order to don personal protective equipment …."

101. Approximately six months later, MC3 Katsareas was reassigned to the legal department to work as alegal clerk with intention of converting to the "Legalman rating." He began his work there on December 9, 2020.

102. For more than two months he continued to maintain his beard without objection.

103. However, on February 17, 2021, MC3 Katsareas received notice that the DCNO wanted a letter from his commander requesting that MC3 Katsareas's accommodation be rescinded. MC3 Katsareas was initially asked to draft this letter himself.

104. On February 26, 2021, MC3 Katsareas received a formal notice of the DCNO's intent to review his accommodation and giving him "ten (10) days from the date of this letter to review and comment on the proposed rescission of your previously approved accommodation." *See* Exhibit G.

105. After being granted a short extension of time, on March 11, MC3 Katsareas submitted comments opposing the proposed rescission. *See* Exhibit H.

106. He is still awaiting final word on whether his accommodation will be rescinded, but based on the denials that other Sailors in similar circumstances have received, MC3 Katsareas reasonably anticipates that his accommodation will be rescinded.

107. To protect his rights secured by the First Amendment to the United States Constitution and RFRA, MC3 Katsareas brings this claim.

ABF3 Braggs's Military Service

108. ABF3 Braggs serves as an Aviation Boatswain's Mate, Fuels—a position that normally involves refueling and maintenance of aircraft.

109. However, due to a back injury, ABF3 Braggs has been placed on limited duty since September 2020 and will remain on limited duty until July 2021.

ABF3 Braggs's Efforts to Obtain an Accommodation

110. Since boot camp, ABF3 Braggs has maintained a partial beard due to a medical no-shave chit. He was granted the chit because he suffers from *pseudofolliculitis barbae*, a skin condition particularly prevalent among African American men that is inflamed by shaving.[23] However, the

[23] Notably, African Americans comprise the largest demographic of Muslim military personnel. Hosein, *Muslims in the U.S. Military: Moral Injury and Eroding Rights*, https://doi.org/10.1007/s11089-018-0839-8. Thus, many other Muslim sailors would be doubly harmed if the Navy does not allow medical or religious accommodations.

chit is insufficient in protecting AFB3 Braggs's religious exercise because he still must shave at least once a month to prove that he still is afflicted with the condition.

111. Further, even if the chit were sufficient, the Navy has previously announced its desire to eliminate the chit in favor of other methods of treating *pseudofolliculitis barbae*, including laser-hair removal.[24]

112. In accord with his beliefs, ABF3 Braggs believes that as devout Muslim man he should wear a fist-length beard.

113. He wishes to comply with the obligations of his sincerely held faith while at the same time serving his county. *See* Exhibit I (Memorandum from CDR Abuhena Saifulislam to Commanding Officer of the USS George Washington (May 7, 2020)).

114. ABF3 Braggs has never had to don a face mask to carry out his responsibilities that would function improperly with a beard. ABF3 Braggs is similarly unaware of any colleagues having to wear such face masks.

115. ABF3 Braggs first requested an accommodation on July 22, 2020. That request was denied on December 23, 2020. The denial specifically highlighted the concern "that a beard reduces safe and effective wear and operation of protective equipment, to include gas masks, self-contained breathing apparatus face masks and respirators" in the event of damage control. *See* Exhibit J ([Braggs Denial Letter] (Dec. 23, 2020)).

116. ABF3 Braggs has appealed the decision to the Chief of Naval Operations contending, *inter alia*, that positive-pressure masks do not require a perfect seal with the face for safe operation. *See* Exhibit K (Feb. 18, 2021). ABF3 Braggs also pointed out that the Navy has routinely granted

[24] *Updated Guidelines for Facial Shaving Condition*, All Hands (Oct. 4, 2019), https://perma.cc/B78D-7ZKV

accommodations for non-religious beards in the past without any indication of adverse consequences.

117. Thus, far, the Chief of Naval Operations has not responded to ABF3 Braggs's appeal.

118. ABF3 Braggs recognizes that the accommodation would be conditional. In the unlikely event that a life-threatening situation arose requiring him to be clean-shaven to properly don a fitted mask, he would comply and shave without objection.

119. Because the Navy has thus far refused to grant him an exemption, ABF3 Braggs now brings this claim to enforce his rights under the First Amendment to the United States Constitution and RFRA.

OS2 Shoyeb's Military Service

120. As a native of New York City, OS2 Shoyeb lived through the horror of September 11, 2001 and has sought to counteract negative stereotypes about American Muslims.

121. Along with a general desire to serve and defend his country, OS2 Shoyeb decided to join the military to show that his love for America and the freedom it stands for does not conflict with his faith.

122. OS2 Shoyeb completed his boot camp and A-School in 2018. He serves as an Operations Specialist.

123. OS2 Shoyeb is stationed aboard the USS Chancellorsville (CG 62), which is currently in dry dock at the Naval Shipyard in Yokosuka, Japan.

OS2 Shoyeb's Efforts to Obtain an Accommodation

124. Throughout his time in the Navy, OS2 Shoyeb has continued to practice his faith to the fullest extent possible. He studies the Quran, prays five times a day, tries to maintain a *halal* diet,

and fasts regularly. In accord with his beliefs, OS2 Shoyeb believes that as a devout Muslim man he should wear a fist-length beard.

125. OS2 Shoyeb recognizes that the accommodation would be conditional. In the unlikely event that he faced a life-threatening situation that would require him to be clean-shaven to properly wear a fitted mask, he would comply and shave without objection.

126. However, the vast majority of OS2 Shoyeb's responsibilities take place at a computer terminal and he is not currently stationed within an active warzone.

127. Given his sincerely held religious beliefs, OS2 Shoyeb sought an accommodation to grow a fist-length beard. OS2 Shoyeb was aware that in March 2020, the Navy updated its guidance on religious accommodations, specifically recognizing religiously motivated beard-wearing as a possible accommodation. *See* Navy Instr. 1730.11A.

128. On June 22, 2020, OS2 Shoyeb lodged a request for a religious accommodation to grow a beard fist-length in conformity with Islamic practice.

129. As part of OS2 Shoyeb's application, Lieutenant Joshua Hickman, a command chaplain, submitted a statement concluding that OS2 Shoyeb sought to grow a beard out of a sincere desire to live in accordance with his faith. *See* Exhibit L.

130. The Deputy Chief of Naval Operations disapproved the request on July 13, 2020.

131. On September 17, 2020, OS2 Shoyeb appealed the disapproval to the Chief of Naval Operations. *See* Exhibit M.

132. The Chief of Naval Operations disapproved the request on December 14, 2020, citing concerns about protective masks being unable to function properly in the unlikely event that OS2 Shoyeb had to don one. In closing, the decision told OS2 Shoyeb to "put your ship and shipmates ahead of yourself." *See* Exhibit N.

133. Like ABF3 Braggs and MC3 Katsareas, OS2 Shoyeb now brings his claim to protect his rights under the First Amendment to the United States Constitution and RFRA

The Navy's Obligation To Provide Religious Accommodations

134. Congress has long demanded that "[u]nless it could have an adverse impact on military readiness, unit cohesion, and good order and discipline, the Armed Forces shall accommodate the individual expression of belief of a member of the armed forces reflecting the sincerely held conscience, moral principles or belief of the member and, in so far as practicable, may not use such expression of belief as the basis of any adverse personnel action, discrimination, or denial of promotion, schooling, training or assignment." National Defense Authorization Act 2013, H.R. 4310, 112th Cong. 2 Sess. (2013) (as amended by National Defense Authorization Act 2014, H.R. 3304, 113th Cong. 1 Sess. (2014)).

135. In response to this directive, in 2014, the Department of Defense amended its Instruction 1300.17 regarding religious accommodations to be more accommodating toward religious minorities.

136. That Instruction was again updated in 2020 and affirmatively provides that the Department of Defense "will accommodate individual expression[] of sincerely held beliefs . . . which do not have an adverse impact on military readiness, unit cohesion, good order and discipline, or health and safety." Defense Instr. 1300.17 § 1.2(b). It further provides that a religious accommodation against a "military policy, practice, or duty [that] substantially burdens a Service Member's exercise of religion can only be denied if: (1) [t]he military policy, practice, or duty is in furtherance of a compelling governmental interest" and "(2) [i]t is the least restrictive means of furthering that compelling governmental interest." Defense Instr. 1300.17 § 1.2(e).

137. Navy Regulations similarly require that commanding officers "use all proper means to foster high morale, and to develop and strengthen the moral and spiritual well-being of the personnel under his or her command" and "provide maximum opportunity for the free exercise of religion by members of the naval service." Article 0820 (1990).

138. A more recent instruction from March 2020 reiterates that "commanders will provide maximum opportunity for the free exercise of religion by members of the naval service." Navy Instr. 1730.11A ¶ 5. That instruction explains that "[r]eligious liberty is more than freedom to worship. It includes the freedom to integrate one's religion into every aspect of one's life." *Id.* ¶ 3.

139. This recent guidance specifically recognized religiously motivated beard-wearing as an accommodation capable of being granted to Sailors. *Id.* at ¶¶ 5(a)(4), 5(b)(2), 5(d)(4)(c).

140. It specifies that "Commanders will not deny or recommend denial of a religious accommodation unless the denial or partial denial furthers a compelling governmental interest and is the least restrictive means of furthering that compelling government interest. *Id*. at ¶¶ 5(a)(2).

141. If a religious accommodation is granted, "[a] commander may require immediate compliance with suspension of [the] religious accommodation only if necessary due to an imminent threat to health or safety." *Id.* ¶ 5(g)(2). Otherwise, "the Sailor or candidate must be given five business days to submit an appeal" of the suspension. *Id.* And "[w]hen the conditions that required the suspension are no longer present, the Sailor may resume the religious practice per the original waiver." *Id.* ¶ 5(g)(3).

The Navy's Alleged Compelling Interest

142. All four Plaintiffs have requested beard accommodations through the appropriate chains of command, and all four have been at least initially denied. Their denial letters have consistently cited safety concerns regarding protective equipment, specifically gas masks and SCBA masks.

143. Specifically, Defendants have repeatedly stated a concern that a beard reduces safe and effective wear and operation of protective equipment, to include gas masks, self-contained breathing apparatus face masks and respirators. See Exs. D, J, N, O.

144. Defendants have conceded, however, that "the probability of a negative consequence from an ineffective seal is relatively low." *Id*.

145. Moreover at any given time, there are thousands of Sailors assigned to duty sections who have beards for medical reasons.

146. And commanders frequently award no-shave chits to boost morale, especially during extended sea duty. Indeed, the Navy has an even more robust historical tradition of bearded sailors—until they were banned in 1985, beards were a defining feature of Navy servicemen.

147. Religious beards have no greater impact on personal protective equipment than these beards, and the Navy cannot claim to have a compelling interest in banning the former while permitting the latter.

148. Neither can the Navy suddenly claim a compelling interest in preventing every marginal risk of harm. Sailors engage in countless activities that may in rare situations lead to injury, yet are still permitted. The Navy cannot show that beards are so unique in this respect as to justify an outright ban.

149. The Navy does not even require fit testing of masks to individual Sailors to reduce the same risk from a poor fit that they claim is created by a religious beard. Instead, they use whichever

SCBA masks are available at the time. Similarly, Sailors have frequently been allowed to participate in advance firefighting training where fire and smoke are used without having to shave existing beards.

Least Restrictive Means

150. Nor can Defendants show that forced shaving is the least restrictive means of resolving their alleged concerns. Even if beards didn't work with standard-issue masks, Defendants cannot show there are no other options that would. *See Singh*, 185 F. Supp. 3d at 231 n.23 (noting that the Army has admitted there are masks "capable of providing protection to individuals who wear beards").

151. The fact that the U.S. Army and Air Force both allow religious beards belies any supposedly compelling reason Defendants may assert for suppressing Plaintiffs' religious exercise. And the allowance for religious beards by militaries around the world, including in the United Kingdom, Canada, Israel, Australia, New Zealand, and India, as well as by police and fire departments throughout the U.S., further undermines Defendants' claims.

152. Defendants bear the burden to show that the approach taken by other branches of the military, by militaries worldwide, and by police and fire departments across the nation is not viable. Defendants have failed to meet this burden.

## CLAIMS

## COUNT I

### Violation of the Religious Freedom Restoration Act
### Substantial Burden

153. Plaintiffs incorporate by reference all preceding paragraphs.

154. Plaintiffs' sincerely held religious beliefs require them to wear neatly maintained beards. Their compliance with these beliefs is a religious exercise.

155. The Navy's discriminatory regulations and treatment expose EMN3 Di Liscia and MC3 Katsareas in particular to serious consequences of military discipline and the loss of their careers for their religious exercise—as they currently wear beards. The only reason the other Plaintiffs do not immediately face these consequences is that OS2 Shoyeb is not currently wearing a beard at all, which is a violation of his sincerely held religious beliefs, and ABF3 Braggs is forced to shave every 30 days to keep his medical accommodation.

156. The Navy's discriminatory regulations and treatment create government-imposed coercive pressure on Plaintiffs to change or violate their religious beliefs.

157. The Navy's discriminatory regulations and treatment chill Plaintiffs' religious exercise.

158. The Navy's discriminatory regulations and treatment impose a substantial burden on Plaintiffs' religious exercise.

159. For ABF3 Braggs in particular, were he forced to submit to laser-hair removal, it would burden his religious exercise not just during his time in the Navy, but for the rest of his life.

160. The Navy's discriminatory regulations and treatment do not further a compelling governmental interest as applied to Plaintiffs.

161. Applying the Navy's discriminatory regulations and treatment to Plaintiffs is not the least restrictive means of furthering any compelling governmental interest.

162. The Navy's discriminatory regulations and treatment of its grooming and personal appearance regulations thus violate rights secured to Plaintiffs by RFRA, 42 U.S.C. § 2000bb, et seq.

163. Plaintiffs have already suffered harm—prevented from living out their sincerely held beliefs, and forced to choose between serving in the U.S. military and following the dictates of

their own consciences. Absent injunctive and declaratory relief, Plaintiffs will continue to be harmed.

## COUNT II

### Violation of the First Amendment to the United States Constitution
### Free Exercise Clause
### Burden on Religious Exercise

164. Plaintiffs incorporate by reference all preceding paragraphs.

165. Plaintiffs' sincerely held religious beliefs require them to wear neatly maintained beards. Their compliance with these beliefs is a religious exercise.

166. The Navy's grooming and personal appearance regulations are not neutral.

167. The Navy's treatment of Plaintiffs is not neutral.

168. The Navy's grooming and personal appearance regulations are not generally applicable.

169. The Navy's treatment of Plaintiffs is not generally applicable.

170. Defendants have created categorical exemptions and individualized exemptions from their grooming and personal appearance regulations.

171. The Navy's discriminatory treatment and grooming and personal appearance regulations create government-imposed coercive pressure on Plaintiffs to change or violate their religious beliefs.

172. The Navy's discriminatory treatment and regulations chill Plaintiffs' religious exercise.

173. The Navy's discriminatory treatment and regulations expose EMN3 Di Liscia and MC3 Katsareas in particular to substantial consequences for their religious exercise of currently wearing beards, including military discipline and the loss of their careers.

174. The Navy's discriminatory treatment and regulations burden Plaintiffs' religious exercise.

175. The Navy's discriminatory treatment and regulations further no compelling governmental interest.

176. The Navy's discriminatory treatment and regulations are not the least restrictive means of furthering Defendants' stated interests.

177. The Navy's discriminatory treatment and its enforcement of its grooming and personal appearance regulations thus violate Plaintiffs' rights as secured by the Free Exercise Clause of the First Amendment to the United States Constitution.

178. Plaintiffs have already suffered harm—prevented from living out their sincerely held beliefs, and forced to choose between serving in the U.S. military and following the dictates of their own consciences. Absent injunctive and declaratory relief against the Navy's regulations, Plaintiffs will continue to be harmed.

## COUNT III

### Violation of the First Amendment to the United States Constitution
### Free Exercise Clause
### Intentional Discrimination

179. Plaintiffs incorporate by reference all preceding paragraphs.

180. Plaintiffs' sincerely held religious beliefs require them to wear neatly maintained beards. Their compliance with these beliefs is a religious exercise.

181. Historically, the Navy has allowed Sailors to maintain quarter-inch beards for medical reasons.

182. Even under new Navy rules discontinuing issuance of permanent no-shave chits (i.e., waivers that allowed Sailors who suffer from *pseudofolliculitis barbae* to permanently grow short, well-kept beards), Sailors can receive an exemption of temporary or indeterminate length, requiring only annual reevaluation. *See* Bureau of Naval Personnel, Management of Navy

Uniformed Personnel Diagnosed with Pseudofolliculitis Barbae, Instruction 1000.22C ¶¶ 6(c)-(e) (Oct. 8, 2019), https://perma.cc/7VLE-JLKX.

183. Despite being informed in detail of Plaintiffs' beliefs, Defendants declined to give them accommodations that would allow them to comply both with their beliefs and the Navy's regulations.

184. Defendants have no legitimate basis for denying Plaintiffs a religious accommodation.

185. Defendants denied Plaintiffs an accommodation because of their religion.

186. Defendants targeted Plaintiffs for heightened scrutiny because they requested an accommodation for their religious beliefs.

187. The Navy's threatening to enforce its regulations against Plaintiffs thus violates their rights under the Free Exercise Clause of the First Amendment to the United States Constitution.

188. The Navy's refusal to grant Plaintiffs accommodations to allow them to practice their religion despite accommodations being granted to other Sailors exhibits a hostility toward Plaintiffs' religion, thus violating their rights under the Free Exercise Clause of the First Amendment to the United States Constitution.

189. Plaintiffs have already suffered harm—prevented from living out their sincerely held beliefs, and forced to choose between serving in the U.S. military and following the dictates of their own consciences. Absent injunctive and declaratory relief, Plaintiffs will continue to be harmed.

## COUNT IV

### Violation of the First Amendment to the United States Constitution
### Freedom of Speech

190. Plaintiffs incorporate by reference all preceding paragraphs.

191. The Navy's regulations prohibit Plaintiffs from expressing their faith through wearing neatly maintained beards.

192. The Navy's discriminatory treatment and regulations place a chilling effect on Plaintiffs' expression of their faith through obedience to their sincerely held beliefs via outward, physical articles of faith.

193. The Navy's discriminatory treatment and regulations constitute content discrimination.

194. The Navy's discriminatory treatment and regulations constitute viewpoint discrimination.

195. As applied to Plaintiffs, the Navy's discriminatory treatment and grooming-and-personal-appearance regulations are not necessary for good order, discipline or national security and do not satisfy strict scrutiny.

196. The Navy's discriminatory treatment and its enforcement of its grooming-and-personal-appearance regulations against Plaintiffs thus violate their rights under the Free Speech Clause of the First Amendment to the United States Constitution.

197. Plaintiffs have already suffered harm. Absent injunctive and declaratory relief, Plaintiffs will continue to be harmed.

## COUNT V

### Violation of the Fifth Amendment to the United States Constitution
### Substantive Due Process

198. Plaintiffs incorporate by reference all preceding paragraphs.

199. Free exercise of religion is a fundamental right.

200. Plaintiffs' sincerely held religious beliefs require them to wear neatly maintained beards. Their compliance with these beliefs is a religious exercise.

201. Plaintiffs' fundamental right to engage in religious exercise has been burdened by the Navy's regulations and its denial of a religious accommodation.

202. The Navy's discriminatory treatment and enforcement of its grooming-and-personal-appearance regulations against Plaintiffs thus violate their rights under the Due Process Clause of the Fifth Amendment to the United States Constitution.

203. Plaintiffs have already suffered harm. Absent injunctive and declaratory relief, Plaintiffs will continue to be harmed.

## COUNT VI

### Violation of the Fifth Amendment to the United States Constitution
### Equal Protection

204. Plaintiffs incorporate by reference all preceding paragraphs.

205. The Navy accommodates other types of personal expression of other service members.

206. The Navy accommodates the grooming preferences or needs of other Sailors by, for example, allowing Sailors who can pay for no-shave waivers to grow beards. It also accommodates the grooming needs of other Sailors by, for example, providing medical waivers that allowing Sailors to grow beards.

207. The Navy's discriminatory treatment and its enforcement of its grooming and personal appearance regulations against Plaintiffs thus violates their rights under the Fifth Amendment to the United States Constitution's guarantee of equal protection.

208. Plaintiffs have already suffered harm. Absent injunctive and declaratory relief, Plaintiffs will continue to be harmed.

## COUNT VII

### Violation of the Fifth Amendment to the United States Constitution
### Procedural Due Process

209. Plaintiffs incorporate by reference all preceding paragraphs.

210. Plaintiffs' sincerely held religious beliefs require them to wear neatly maintained beards. Their compliance with these beliefs is a religious exercise.

211. Enforcement of the Navy's regulations against EMN3 Di Liscia and MC3 Katsareas—disciplining them for wearing beards—would result in the loss of their livelihoods as Sailors and violate their procedural due process rights by wrongfully impairing their property and liberty interests.

212. Plaintiffs have already suffered harm. Absent injunctive and declaratory relief, Plaintiffs will continue to be harmed.

## PRAYER FOR RELIEF

Wherefore, Plaintiffs respectfully request that the Court:

a. Declare that the Religious Freedom Restoration Act requires the Navy to cease discriminating against Plaintiffs and accommodate their religious exercise in maintaining a beard as set forth above;

b. Declare that the First Amendment of the United States Constitution requires the Navy to cease discriminating against Plaintiffs and accommodate their religious exercise in maintaining a beard as set forth above;

c. Declare that the Fifth Amendment of the United States Constitution requires Defendants to cease discriminating against Plaintiffs and accommodate Plaintiffs' religious exercise in maintaining a beard as set forth above;

d. Issue a temporary restraining order and a preliminary injunction enjoining Defendants from requiring EMN3 Di Liscia, MC3 Katsareas, and ABF3 Braggs to shave their existing beards;

e. Issue a permanent injunction (1) enjoining Defendants from enforcing the Navy's grooming-and-personal-appearance regulations against Plaintiffs, insofar as the regulations prohibit them from keeping neatly maintained beards; (2) ordering Defendants to permit Plaintiffs to continuing serving in the Navy regardless of whether they wear beards; and (3) ordering that the injunction will apply to all Navy posts that Plaintiffs will hold in the future, unless the Navy makes an individualized showing of a compelling governmental interest that cannot be satisfied by less restrictive means;

f. Award nominal damages and compensatory damages;

g. Award Plaintiffs the costs of this action and reasonable attorney fees; and,

h. Award such other and further relief as it deems equitable and just.

**JURY DEMAND**

Plaintiffs request a trial by jury on all issues so triable.

Respectfully submitted this 15th day of April, 2021.

/s/ Eric S. Baxter
Eric S. Baxter (D.C. Bar No. 479221)
Daniel Blomberg (D.C. Bar No. 1032624)
Diana M. Verm (D.C. Bar No. 1811222)
Kayla A. Toney (D.C. Bar No. 1644219)
(*admission pending*)
The Becket Fund for Religious Liberty
1919 Pennsylvania Ave. NW, Suite 400
Washington, DC, 20006
(202) 955-0095 PHONE
(202) 955-0090 FAX
*ebaxter@becketlaw.org*

Amandeep S. Sidhu (D.C. Bar No. 978142)
Winston & Strawn LLP
1901 L St., NW
Washington, DC, 20036-3506
(202) 282-5828 PHONE
(202) 282-5100 FAX
*asidhu@winston.com*

*Counsel for Plaintiffs*