# Exhibit H

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| EDMUND DI LISCIA, et al., ) | |
| ) | |
| Plaintiffs, ) | |
| ) | |
| v. ) | Civil Action No. 21-01047 (TJK) |
| ) | |
| LLOYD J. AUSTIN, III, *et al.*, ) | |
| ) | |
| Defendants. ) | |

### DECLARATION OF DIANE CUA

I, CDR Diane Cua, U.S. Navy, hereby declare under penalty of perjury pursuant to 28 U.S.C. § 1746:

1. I am the Deputy Branch Head for Officer Plans and Policy (N131B) for the Deputy Chief of Naval Operations (Manpower, Personnel, Training and Education) (DCNO N1). I am a Surface Warfare Officer in the U.S. Navy, and I have served in this capacity for nineteen years. During my time in the Navy, I have served in engineering, navigation, and operation billets at sea. In my most recent assignment, I commanded USS CURTIS WILBUR (DDG 54), an Arleigh Burke-class destroyer forward deployed to Yokosuka, Japan.

2. Currently, I am acting in the role of Branch Head for Officer Plans and Policy. In this capacity, I am responsible for the development and execution of officer accessions, promotions, retention plans, as well as policies and strategies, which impact Active and Reserve Officers. Additionally, I oversee policy guidance for emerging issues across the Fleet such as religious accommodation.

3. Since June of 2021, I have participated in the adjudication of religious accommodation requests submitted to Deputy Chief of Naval Operations (DCNO), N1, by evaluating the facts and circumstances of each case and providing a recommendation on whether granting each requested accommodation would have a negative impact on a compelling government interest. Where the facts indicate that granting a requested accommodation would harm a compelling government interest, I make a recommendation regarding the least restrictive means available to further the compelling interest while accommodating the requester's religious practice to the greatest extent possible.

4. I am familiar with the religious accommodation request submitted by OS2 Shoyeb's because I thoroughly reviewed the case file as part of my official duties. The request was adjudicated before I reported to DCNO N1.

5. The Navy has a compelling government interest in mission accomplishment, which includes being able to safely fight a fire or address a toxic gas casualty aboard a ship. These two crucial damage control evolutions require Navy personnel assigned to ships to wear self-contained breathing apparatuses (SCBAs) that seal to their faces to keep toxic fumes out and breathable air in. The Naval Safety Center reports that facial hair of any length interferes with the ability to get an effective seal on an SCBA. *See* COMNAVSAFECEN ltr 5100 Ser/013 of 22 Oct 18 (attached hereto as Ex. 1). Because shipboard fires and toxic gas casualties can occur at any moment, without warning, essentially all U.S. Navy personnel performing duties aboard a ship must be clean shaven so that they can don SCBAs and respond to a fire or casualty at a moment's notice.

6. There are no lesser means available to accommodate OS2 Shoyeb's request. As long as OS2 Shoyeb is stationed aboard a warship, he must be able to safely participate in shipboard firefighting. The Navy needs OS2 Shoyeb at sea to accomplish the mission. OSs, or "Operations Specialists," have limited billets ashore, and their value to the Navy is realized at sea. OSs are responsible for safe navigation of the ship as well as operating radar systems to provide tactical information for mission accomplishment.

7. As set forth in paragraph 5.a. of the denial letter sent to OS2 Shoyeb from the DCNO N1 on July 13, 2020, damage control (DC), both in port and underway, is the responsibility of each member of a ship's crew. Shipboard DC includes firefighting and responses to different types of casualties, including toxic gas leaks, flooding, and battle damage. Each member of the crew of a U.S. Navy ship is assigned a General Quarters (GQ) station for addressing the most serious casualties, as well as an in-port duty assignment that often includes DC responsibilities. A ship at sea must be able to depend upon its own crew to address casualties of this nature because there is no fire department available to render aid. At any moment, a fire or other casualty could block off parts of the ship, requiring all personnel present to take up firefighting duties, regardless of their regular GQ or in-port emergency team assignments. Further, a mass conflagration, especially in a main space where temperatures can become dangerously high, may require many waves of firefighters, with the majority of a ship's crew taking turns at fighting the fire. Because of these requirements, all personnel assigned to a ship are required to qualify for basic DC, which includes receiving active firefighting training.

8. The fires that destroyed USS BONHOMME RICHARD (LHD 6) and USS MIAMI (SSN 755) are illustrative examples of the need for Navy personnel to be able to address fires with no advance notice. On July 12, 2020, a fire broke out onboard BONHOMME RICHARD while it was pier side in San Diego, California. The fire burned for five days and was finally extinguished with the assistance of several shore-based fire departments. On May 23, 2012, USS MIAMI

2

experienced a fire that gutted the ship. Damage from these two fires led to the ships decommissioning years ahead of schedule. These examples illustrate the importance of personnel aboard each ship having the capability to respond to a fire instantaneously, with no advance notice. The quicker a fire is extinguished, the less damage it will cause. Waiting for a shore-based fire department to respond is never an option. Ships at sea must be able to rely on their own crews, and ships at the pier risk catastrophic damage if firefighting efforts are delayed.

9. OS2 Shoyeb is assigned to USS CHANCELLORSVILLE (CG 62). As a Ticonderoga-class guided-missile cruiser, CHANCELLORSVILLE has a crew of 355 personnel. When the ship is in port, the crew is divided into six duty sections, meaning 1/6 of the crew spends the night onboard the ship each night in port to keep the ship operating and to be ready in the event of a fire or other casualty. At present, CHANCELLORSVILLE is in the basic phase of training, having completed its maintenance availability in May 2021. A ship in basic phase trains and certifies watch teams in all mission areas in order to perform operations as a unit.

10. Commanding Officer, USS CHANCELLORSVILLE, informed DCNO N1 that, in the event of a fire at sea, OS2 Shoyeb would be in the Combat Information Center (CIC) at an Aegis Display Console as either Track Data Coordinator (TDC) or Identification Supervisor (IDS). His DC assignments in this capacity would be limited to immediately responding to a casualty within CIC, to include using an SCBA.

11. In port, OS2 Shoyeb is expected to be able to perform in a DC position on the In-port Emergency Team Watch Bill. OS2 Shoyeb's Commanding Officer reported to N1 that OS2 Shoyeb is qualified to perform DC duties up to the position of Damage Control Team leader. He would be expected to perform his role on the In-port Emergency Team, to include wearing an SCBA. Even if not assigned to the In-port Emergency Team, he is trained, qualified, and expected to contribute to the response to any casualty which requires personnel greater than provided by the immediate response team. Again, the USS BONHOMME RICHARD fire is as a prime example, where all personnel in the area contributed for days to combat that casualty.

I declare under the penalty of perjury, pursuant to 28 U.S.C. § 1746, that the foregoing is true and correct to the best of my knowledge.

02 AUG 2021
Date

*Diane S. Cua* (signature)
Diane S. Cua

# Exhibit 1



**DEPARTMENT OF THE NAVY**
NAVAL SAFETY CENTER
375 A STREET
NORFOLK, VA 23511-4399

```
                                          5100
                                          Ser/013
                                          22 Oct 2018
```

From: Commander, Naval Safety Center
To:   Chief of Naval Personnel

Subj: FACE SEAL GUIDANCE UPDATE

Ref:  (a) Commander, Naval Safety Center ltr 5100/Ser 00/0123
          dated 8 March 2016, Face Seal Guidance

Encl: (1) Validation of Face Seal Guidance and Supplementary
          Research

1. In response to your request to revisit the applicability as well as validity of reference (a), the Naval Safety Center conducted an exhaustive review of the original research, references, and conclusions. In addition, supplementary research was conducted and inquiries made with regulatory agencies, manufacturers of respirators, and other military services to ensure the ultimate conclusions were accurate. Enclosure (1) contains the details of the research.

2. The results indicate the original research and conclusions are still valid. The Naval Safety Center stands by the original conclusion that deviations from the current prescribed facial hair grooming standards represent significant increased risk to the individual. Subsequent risk is also incurred by other crew members that may have to assist or rely upon these individuals.

MARK L. LEAVITT

**Validation of Face Seal Guidance and Supplementary Research**

Ref:   (a) Letter to All Respirator Manufacturers from the National Institute for Occupational Safety and Health (NIOSH) dated 2 October 2006.
       (b) NIOSH Conformity Assessment Interpretation Notice 2018-1005 dated August 2018
       (c) NIOSH Facial Hairstyles and Filtering Facepiece Respirators Infographic dated 2017
       (d) OSHA 1910.134 Interpretation Letter dated 9 May 2016
       (e) AFI 36-2903 Dress and Personal Appearance
       (f) JKP 3.61.1 Joint Manual of CNRN Defense
       (g) BRd 2170(2) Ship CBRNDC Manual

1. All references from the original research were validated as still current and effective except the 2006 National Institute for Occupational Safety and Health (NIOSH) (reference (a)). The 2006 letter has been updated by reference (b) which is an interpretation notice providing amplifying guidance. In addition, NIOSH, the respirator accrediting agency, also developed an infographic of acceptable facial hair styles, reference (c). Both new products support the previous NIOSH position; in fact, they provide additional information to make it easier to understand the importance of no facial hair along the sealing area of the respirator.

2. The Occupational Safety and Health Administration (OSHA) regulation for respirators, 29 CFR 1910.134, is unchanged. Since the original research was published there has been an additional letter of interpretation released addressing facial hair and respirator fit. Reference (d) reiterates that facial hair is not allowed in the sealing surface of the respirator.

3. The United States Air Force (USAF) policy has not been changed. The U.S. Air Force Safety Center/Headquarters, Deputy Chief of Safety report that the USAF complies fully with OSHA requirements and does not allow facial hair on the sealing surfaces of respirators. As an example of their application, reference (e) states, "In cases where aircrew with condition such as pseudofolliculitis barbae that regularly wear a mask would have to show adequate mask seals as part of their regularly aircrew equipment checks, otherwise they would be disqualified."

Enclosure (1)

4. The Royal Navy states in reference (f) that all Naval personnel are required to shave prior to fit test and states that facial hair growth will prevent a respirator forming a seal against the face. Reference (g) is the Royal Navy policy that contains guidance for the removal of beards and information relating to exemptions. For religious groups in which a beard is a key tenant of their religion, they are exempt from predeployment fit testing; however, they are not considered "at readiness" for CBRN. Royal Navy guidance on beard removal is dependent upon if they are required to deploy with respirator and on threat level. As an example, "Those submariners who by virtue of their onboard role, deploy with respirators must comply with this, however, those who do not deploy with respirators are exempt."

5. The major manufacturers of respirators in the United States were contacted including MSA, 3M, and Scott. Technical representatives were contacted and user manuals reviewed. All manufacturers contacted stated they have not changed their policy on respirator usage in that all positive/negative pressure respirators require clean, smooth faces in order to have a seal. In each user manual for respirators reviewed, there is a warning. MSA states, "Ensure that there is no hair between the facepiece's seal and the user's skin. Failure to follow these warnings can result in serious personal injury or death."

Enclosure (1)

DEPARTMENT OF HEALTH & HUMAN SERVICES

Public Health Service

Centers for Disease Control
 and Prevention (CDC)
National Institute for Occupational
 Safety and Health (NIOSH)
National Personal Protective
 Technology Laboratory (NPPTL)
P.O. Box 18070
Pittsburgh, PA 15236-0070
Phone:  412-386-4000
Fax:     412-386-4051

October 2, 2006

# LETTER TO ALL RESPIRATOR MANUFACTURERS

**Subject: NIOSH Policy for Respirator Sealing Surfaces and Facial Hair**

It has been brought to the attention of NIOSH through phone calls and emails from respirator users and manufacturers that some respirator manufacturers may not understand what NIOSH defines as the sealing surface for respirators and consequently are inappropriately marketing respirators for users with facial hair.

Facial hair that lies along the sealing area of a respirator, such as beards, sideburns, or mustaches will interfere with respirators that rely on a tight facepiece fit to achieve maximum protection. The areas of the skin, which contact the face or neck seal and nosecup seal, must be free of any hair.

If a unit has been approved with a nosecup in place and has passed NIOSH $CO_2$ and fogging tests using the nosecup, then the nosecup must not come in contact with facial hair, even if there is another seal being used as the primary seal (such as a neck seal). Specifically, respirator configurations using hood-style facepieces that have been tested and certified by NIOSH using a nose cup require a clean-shaven sealing surface at the nosecup.

Any respirator manufacturer making false claims such as advertising a tight fitting, full facepiece or hooded SCBA unit that is configured with a nose cup, for users with facial hair, may be subject to rescission of NIOSH approval.

       Sincerely yours,


       Heinz W. Ahlers
       Chief, Technology Evaluation Branch
       National Personal Protective Technology Laboratory

Reference (a)

# NIOSH Conformity Assessment Interpretation Notice

**NIOSH CA 2018-1005**
**August 2018**

NIOSH Respirator Approval Program's updated position regarding facial hair and the selection and use of respiratory protective devices

Supersedes October 2, 2006 Letter to All Respirator Manufacturers



Centers for Disease Control and Prevention
National Institute for Occupational Safety and Health

Reference (b)

| Document Number<br>NIOSH CA 2018-1005 | Page 2 of 4 |
|---|---|

**Subject: NIOSH Respirator Approval Program's updated position regarding facial hair and the selection and use of respiratory protective devices**

1  SUMMARY

NIOSH has been asked to clarify the October 2, 2006 NIOSH "*Letter to all Manufacturers*" titled: *NIOSH Policy for Respirator Sealing Surfaces and Facial Hair*. This notice is intended to clarify the NIOSH definition of respirator sealing surfaces and supersedes the October 2, 2006 letter.

Specific to the evaluations completed as part of the NIOSH Respirator Approval Program and testing to assess the fit characteristics of all respirator designs, NIOSH test subjects are required to be clean shaven in order to participate on the test panel selected.

The Occupational Safety and Health Administration (OSHA) Respiratory Protection Standard 29 Code of Federal Regulations (CFR) 1910.134 paragraph (g)(1)(i) states, "*The employer shall not permit respirators with tight-fitting facepieces to be worn by employees who have: Facial hair that comes between the sealing surface of the facepiece and the face or that interferes with valve function; or Any condition that interferes with the face-to-facepiece seal or valve function*".

The OSHA requirement is interpreted as: When a respirator is required, an employer is prohibited from allowing respirators with tight-fitting facepieces to be worn by employees who have "facial hair that comes between the sealing surface of the facepiece and the face or that interferes with valve function. Facial hair is allowed as long as it does not protrude through the respirator seal, or extend far enough to interfere with the device's valve function."

Specific to the required individual workplace fit test, NIOSH continues to support the OSHA regulations, in this case, regarding the employee's facial hair, 29 Code of Federal Regulations (CFR) Part 1910 Appendix A, Part I, (A)(9) states, "*The test shall not be conducted if there is any hair growth between the skin and the facepiece sealing surface, such as stubble beard growth, beard, mustache or sideburns which cross the respirator sealing surface. Any type of apparel which interferes with a satisfactory fit shall be altered or removed.*"

2  AUTHORITY

42 C.F.R. Part 84, Respiratory Protective Devices
Subpart H, Self-contained breathing apparatus (SCBA)
Subpart G, Gas masks
Subpart J, Supplied-air respirators (SAR)
Subpart K, Non-powered air-purifying particulate respirators (APR)
Subpart L, Chemical cartridge respirators (APR)
Subpart KK, Powered air-purifying particulate respirators (PAPR)

| Document Number | Page 3 of 4 |
|---|---|
| NIOSH CA 2018-1005 | |

## 3 BACKGROUND and SUPPLEMENTAL INFORMATION

OSHA and ANSI Z88.10-2010 prohibit fit testing when facial hair is at the sealing surface of the respirator. OSHA's Fit Testing Procedures, 29 CFR 1910.134 Appendix A, Part I, (A)(9), states *"The test shall not be conducted if there is any hair growth between the skin and the facepiece sealing surface, such as stubble beard growth, beard, mustache or sideburns which cross the respirator sealing surface. Any type of apparel which interferes with a satisfactory fit shall be altered or removed."*

*Facial hair that lies along the sealing area of the respirator, such as beards, sideburns, moustaches, or even a few days growth of stubble, should not be permitted on employees who are required to wear respirators that rely on tight facepiece fit to achieve maximum protection. Facial hair between the wearer's skin and the sealing surfaces of the respirator will prevent a good seal. A respirator that permits negative air pressure inside the facepiece during inhalation may allow leakage and, in the case of positive pressure devices, will either reduce service time or waste breathing air. A worker should not enter a contaminated work area when conditions prevent a good seal of the respirator facepiece to the face.* [NIOSH, 1987, "NIOSH Guide to Industrial Respiratory Protection"]

An up to date clarification of this NIOSH position is as follows:

Facial hair that lies along the sealing area of the respirator, such as beards, sideburns, moustaches, or even a few days growth of stubble, should not be permitted on employees who are required to wear respirators that rely on tight facepiece fit. Facial hair either growing in or protruding into the area of the primary sealing surfaces of the respirator will prevent a good seal. Any degradation to the respirator seal will degrade the ability of the respirator to deliver protection, in effect it will have a reduced protection factor. Respirators that normally support a negative pressure in the facepiece will have an increased potential to allow leakage of contaminated air into the facepiece. Respirators designed to maintain a positive facepiece pressure will suffer from reduced service time along with wasting breathing air during use. A worker should not enter a contaminated work area when conditions prevent a good seal of the respirator facepiece to the face.

This interpretation applies to all primary seals of tight-fitting full and half facepiece respirators, as well as tight-fitting respirator designs that rely on a neck dam seal.

This interpretation does not apply to loose fitting hood or helmet respirator designs such as those used on Powered Air Purifying Respirators, Supplied Air Respirators and Constant-Flow Escape type SCBAs that utilize only capes or shrouds for primary seals. With these type respirators, careful consideration must be given in using these loose fitting face coverings to assure that they do not have a neck dam, a face seal or an integrated, tight-fitting half mask. These respirators, utilizing only capes or shrouds as primary seals, may then be selected and used by workers with facial hair.

| Document Number<br>NIOSH CA 2018-1005 | Page 4 of 4 |
|---|---|

If a respirator covering includes a hood design and the primary seal around the neck of the wearer, facial hair, such as a full beard, cannot be present in the area of the seal. Additionally, if a hood design includes a primary seal within the hood, by including a component covering the mouth, nose and chin of the wearer (similar to a typical half mask), facial hair cannot be present in the area of the seal of this component.   In the event that the respirator design incorporates any one of these sealing mechanisms, facial hair must be prevented from interfering with the sealing surface and the function of the respirator during use.

Escape-only types of air purifying respirators are not required by OSHA to be fit tested, but special care must be exercised whenever they are being carried for potential use.  For all tight-fitting, escape-only respirators, precautions must be taken to assure that the seal needed for effective use will not be affected by facial hair or body hair in the event the respirators would be needed for escape from a toxic atmosphere.

Mouth-bit type escape only respirators are inherently unaffected by facial hair, face size, or neck size and their use and fitting characteristics are not dependent on these features.

## 4     REFERENCES

Approval of Respiratory Protective Devices, 42 C.F.R, Part 84

https://www.cdc.gov/niosh/npptl/resources/pressrel/letters/lttr-100206.html

https://www.osha.gov/pls/oshaweb/owadisp.show_document?p_table=STANDARDS&p_id=9780

https://www.osha.gov/laws-regs/standardinterpretations/2012-09-14

ANSI/AIHA/ASSE-Z88.10 Respirator Fit Testing Methods 2010 Edition

NIOSH Guide to Industrial Respiratory Protection, p119

https://blogs.cdc.gov/niosh-science-blog/2017/11/02/noshave/




Standard Interpretations / Facial hair and respirator fit

- **Standard Number:** 1910.134(g)(1)(i)(A) ; 1910.134(g)(1)

> OSHA requirements are set by statute, standards and regulations. Our interpretation letters explain these requirements and how they apply to particular circumstances, but they cannot create additional employer obligations. This letter constitutes OSHA's interpretation of the requirements discussed. Note that our enforcement guidance may be affected by changes to OSHA rules. Also, from time to time we update our guidance in response to new information. To keep apprised of such developments, you can consult OSHA's website at http://www.osha.gov.

May 9, 2016

Mr. Matthew Sands
606 F Avenue
Altus Air Force Base, Oklahoma 73523

Dear Mr. Sands:

Thank you for your letter to the Occupational Safety and Health Administration (OSHA). Your letter has been referred to the Directorate of Enforcement Programs for an answer to your question. Your letter requested clarification on OSHA's Respiratory Protection standard, 29 CFR 1910.134, which addresses facial hair and respirator fit. This letter constitutes OSHA's interpretation only of the requirements herein, and may not be applicable to any questions not delineated within your original correspondence. Your paraphrased question and our response is below.

**Question:** If an employee with a neatly trimmed goatee is wearing a respirator and it does not interfere with the seal of the face piece or valve function, and has passed a fit test, does this meet the intent of the OSHA's Respiratory Protection standard?

**Response:** The Respiratory Protection standard, paragraph 29 CFR 1910.134(g)(1)(i)(A), states that respirators shall not be worn when facial hair comes between the sealing surface of the facepiece and the face or that interferes with valve function. Facial hair is allowed as long as it does not protrude under the respirator seal, or extend far enough to interfere with the device's valve function. Short mustaches, sideburns, and small goatees that are neatly trimmed so that no hair compromises the seal of the respirator usually do not present a hazard and, therefore, do not violate paragraph 1910.134(g)(1)(i).

In general, however, beards present serious problems for tight-fitting facepiece respirators because their texture and density vary daily, causing unreliable respirator fit and, therefore, present a higher potential for leakage. However, some other types of respirators do not require a face seal, and thus, usually can be worn with facial hair, such as loose fitting powered air-purifying respirators and hooded powered air-purifying respirators.

OSHA has addressed similar questions and outlined the Agency's interpretation in letters posted on OSHA's public website, www.osha.gov. See 3/7/2003 and 4/1/2011 letters of interpretation to Senator Levin and Mr. Randy Southard, respectively (copies enclosed). In addition, OSHA's *Small Entity Compliance Guide for the Respiratory Protection Standard* (#3384) and the compliance directive, *Inspection Procedures for the Respiratory Protection*

Reference (d)

*Standard,* CPL 02-00-158, provide additional information. These two guidance documents and others can be found on the Respiratory Protection Safety and Health Topics page at http://www.osha.gov/SLTC/respiratoryprotection/index.html.

Thank you for your interest in occupational safety and health. We hope you find this information helpful. OSHA's requirements are set by statute, standards, and regulations. Our letters of interpretation do not create new or additional requirements but rather explain these requirements and how they apply to particular circumstances. This letter constitutes OSHA's interpretation of the requirements discussed. From time to time, letters are affected when the agency updates a standard, a legal decision impacts a standard, or changes in technology affect the interpretation. To assure that you are using the correct information and guidance, please consult OSHA's website at http://www.osha.gov. If you have further questions, please feel free to contact the Office of Health Enforcement at (202) 693-2190.

Sincerely,

Thomas Galassi, Director
Directorate of Enforcement Programs

Enclosures

# UNITED STATES DEPARTMENT OF LABOR

Occupational Safety & Health Administration
200 Constitution Ave NW
Washington, DC 20210
800-321-6742 (OSHA)
TTY
www.OSHA.gov

**FEDERAL GOVERNMENT**

White House
Affordable Care Act
Disaster Recovery Assistance
USA.gov
Recovery Act
No Fear Act
No Fear Act Data
U.S. Office of Special Counsel

**OCCUPATIONAL
SAFETY & HEALTH**

Frequently Asked Questions
A - Z Index
Freedom of Information Act
Read the OSHA Newsletter
Subscribe to the OSHA Newsletter
OSHA Publications
Office of Inspector General

## ABOUT THIS SITE

Freedom of Information Act
Privacy & Security Statement
Disclaimers
Important Website Notices
Plug-Ins Used by DOL
Accessibility Statement

# Non-Regulatory References

Paragraph 3 information and reference (e) was provided by email from HQ USAF Deputy Chief of Safety (Col. Larry Nixon) and USAF Safety Center OSH Director (Bill Parsons).

Paragraph 4 information and references (f) and (g) were provided by email from Royal Navy Safety Centre (Commander Justin Saward).

Paragraph 5 information was obtained by telephone conversations with manufacturers. Links below are examples of user guides for various respirators:

    http://s7d9.scene7.com/is/content/minesafetyappliances/10183984-G1%20Industrial%20SCBA%20User%20Manual-EN (Warning page 29)

    http://s7d9.scene7.com/is/content/minesafetyappliances/Operating_Manual_G1_SCBA_NFPA_CBRN_10158406 (Warning page 37)