**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

**EDMUND DI LISCIA**, *et al.*,

*Plaintiffs*,

v.

**PETE HEGSETH**, in his official capacity as Secretary of the United States Department of Defense, *et al.*,

*Defendants*.

No. 1:21-cv-01047-TJK

# AMICUS BRIEF OF MUSLIM PUBLIC AFFAIRS COUNCIL AND ISLAM AND RELIGIOUS FREEDOM ACTION TEAM IN SUPPORT OF PLAINTIFF'S MOTION TO ENFORCE STIPULATION

JOSHUA C. MCDANIEL
Harvard Law School
Religious Freedom Clinic
6 Everett Street, Suite 5110
Cambridge, MA 02138
(617) 496-4383
jmcdaniel@law.harvard.edu

*Counsel for Amici Curiae*

## CORPORATE DISCLOSURE STATEMENT

Amici Muslim Public Affairs Council and the Religious Freedom Institute (of which the Islam and Religious Freedom Action Team is a part) are Section 501(c)(3) certified nonprofit organizations that advocate for Muslim Americans and seek to foster tolerance, understanding, and dialogue. Both the Council and the Institute do not have a parent corporation and do not issue stock. *See* LCvR 7(o)(5); Fed. R. App. P. 26.1, 29(a)(4)(A).

Dated: October 23, 2026

*/s/ Joshua C. McDaniel*
Joshua C. McDaniel

## TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT....................i

TABLE OF AUTHORITIES....................iii

INTEREST OF AMICI CURIAE....................1

ARGUMENT....................2

I. Muslims and other religious minorities are required by their faith to maintain a beard....................3

II. Forcing sailors like OS1 Shoyeb to choose between their faith and their country seriously burdens their ability to practice their faith....................4

III. Accommodating religious minorities serves the Navy's interests....................6

IV. The Court should not credit generalized safety assertions as grounds for abandoning the stipulation....................8

A. Courts must scrutinize, not blindly defer to, the military's asserted interests....................8

B. History and experience show that beards longer than a quarter inch are compatible with naval service....................10

CONCLUSION....................12

CERTIFICATE OF COMPLIANCE....................14

## TABLE OF AUTHORITIES

### Cases

*Ali v. Stephens*,
822 F.3d 776 (5th Cir. 2016) ........ 3

*Burwell v. Hobby Lobby Stores, Inc.*,
573 U.S. 682 (2014) ........ 8

*Elrod v. Burns*,
427 U.S. 347 (1976) ........ 5

*Fraternal Ord. of Police Newark Lodge No. 12 v. City of Newark*,
170 F.3d 359 (3d Cir. 1999) ........ 3

*Fulton v. City of Philadelphia*,
593 U.S. 522 (2021) ........ 9

*Geller v. Sec'y of Def.*,
423 F. Supp. 16 (D.D.C. 1976) ........ 4, 12

*Goldman v. Weinberger*,
475 U.S. 503 (1986) ........ 9

*Gonzales v. O Centro Espírita Beneficente União do Vegetal*,
546 U.S. 418 (2006) ........ 9

*Hamilton v. Schriro*,
74 F.3d 1545 (8th Cir. 1996) ........ 3

*Holt v. Hobbs*,
574 U.S. 352 (2015) ........ *passim*

*Ramirez v. Collier*,
595 U.S. 411 (2022) ........ 9, 10

*Roman Cath. Diocese of Brooklyn v. Cuomo*,
592 U.S. 14 (2020) ........ 4

*Sherbert v. Verner*,
374 U.S. 398 (1963) ........ 5

*Singh v. Berger*,
56 F.4th 88 (D.C. Cir. 2022) ........ *passim*

*Singh v. Carter*,
168 F. Supp. 3d 216 (D.D.C. 2016) .......... 4, 6, 9, 10

*Singh v. McHugh*,
185 F. Supp. 3d 201 (D.D.C. 2016) .......... 10

*Trinity Lutheran Church of Columbia, Inc. v. Comer*,
582 U.S. 449 (2017) .......... 5

*Warsoldier v. Woodford*,
418 F.3d 989 (9th Cir. 2005) .......... 4

*Winter v. Nat. Res. Def. Council, Inc.*,
555 U.S. 7 (2008) .......... 10

**Statutes**

National Defense Authorization Act for Fiscal Year 2016, Pub. L. No. 114-92,
§ 528, 129 Stat. 726 .......... 6

National Defense Authorization Act for Fiscal Year 2016, Pub. L. No. 114-92,
§ 528, 129 Stat. 726, 814 .......... 6

**Other Authorities**

Alison Bath, *Let It Grow: Sailors, Marines Disgruntled by Beard Ban Find Favorable Reception to Challenges*, Stars & Stripes (Jan. 27, 2023),
https://perma.cc/6PZ5-YRCA .......... 15

David Deppmeier, *Ramadan and Religious Accommodation for Soldiers*, U.S. Army, (June 20, 2013), https://perma.cc/Y4RG-GEA8 .......... 11

Decl. of Graham Miller, ECF No. 16-7 *Toor v. Berger*, No. 1:22-cv-01004-RJL, (D.D.C. Apr. 13, 2022). .......... 16

Def. Logistics Agency, *Meal, Religious, Kosher/Halal,* https://perma.cc/L954-USTQ .......... 11

Dep't of the Navy, *BUPERSINST 1730.11A, Standards & Procs. Governing the Accommodation of Religious Pracs.* (Mar. 16, 2020) .......... 11

Dep't of the Navy, *OPNAVINST 1730.1F*, Religious Ministry in the Navy (Nov. 9, 2022). .......... 12

Edward E. Curtis IV, Muslim Americans in the Military: Centuries of Service (2016) .......... 11

H.R. Rep. No. 103-88 (1993). .......... 14

Harold G. Koenig, *"Spiritual Readiness" in the U.S. Military*, 62 J. Religion & Health 1561 (2023). .......... 12

*Religious Accommodations*, My Navy HR, https://perma.cc/K8CF-56XL .......... 10

Teresa Watanabe & Duke Helfand, *A Bridge Between Mosque and Military*, L.A. Times (Nov. 12, 2009), https://perma.cc/XY57-CGNM .......... 11

*The Religious Freedom Restoration Act: Hearing on S. 2969 Before the S. Comm. on the Judiciary*, 102d Cong. 77 (1992). .......... 8

U.S. Naval Inst. Staff, *A Brief History of Grooming in the U.S. Navy*, USNI News (Oct. 23, 2014), https://perma.cc/66WG-TCSE. .......... 15

## INTEREST OF AMICI CURIAE[1]

As associations that advocate for the interests of Muslim Americans, amici promote government policies that treat Muslims and other religious minorities with equality, dignity, and respect. The Muslim Public Affairs Council is a nonprofit public affairs organization that has worked since its founding in 1988 to enhance American pluralism, improve understanding, and speak out on policies that affect American Muslims. Through government, media, and community engagement, the Council leads the way in encouraging more nuanced portrayals of Muslims in American society and ensuring that American Muslim voices are represented to shape public policy and national conversations. The Islam and Religious Freedom Action Team is a part of the Religious Freedom Institute, a nonprofit public affairs organization. The Action Team promotes religious freedom by supporting Muslim perspectives. It engages in research, education, and public policy outreach to foster religious freedom and support the inclusion of Muslims across various sectors of public civic society.

Amici submit this brief to share the perspective of American Muslims and to highlight more broadly the concerns at stake for minority religious communities. The Muslim Public Affairs Council previously filed a brief in *Singh v. Berger*, 56 F.4th 88 (D.C. Cir. 2022), supporting Sikh recruits who sought religious accommodations from Marine Corps grooming policies that required them to shave their beards and cut

[1] No party's counsel authored this brief in whole or in part; no party or party's counsel contributed money intended to fund preparing or submitting this brief; and no person other than amici, their members, or their counsel contributed money intended to fund preparing or submitting this brief.

their hair. Here, Plaintiff Operations Specialist First Class ("OS1") Mohammed Shoyeb secured religious beard accommodations from the Navy through a stipulation. OS1 Shoyeb is a devout Muslim and has served with a beard in the Navy under that stipulation. But after five years of service, including one year of sea duty, the Navy now seeks to back away from that agreement. As amici explain, forcing OS1 Shoyeb to choose between his faith and his service violates his fundamental right to practice his faith.

## ARGUMENT

Although OS1 Shoyeb's motion seeks relief for one Muslim sailor, the religious practice implicated by the Navy's beard requirement is shared by many religious communities. Defendants seek to force OS1 Shoyeb into an impossible choice between his military service and his religious beliefs, despite previously agreeing that he could maintain his beard for the pendency of this litigation. This forced choice harms not just OS1 Shoyeb. By refusing accommodations for service members of faith like OS1 Shoyeb, the Navy harms its spiritual readiness and hinders its ability to recruit and retain talented Americans of minority religions, harming its interests. Finally, requiring OS1 Shoyeb to shave would violate RFRA. While Defendants now argues that OS1 Shoyeb needs to be clean-shaven for safety reasons, it can't carry its burden. Defendants haven't shown a compelling interest in forcing him to shave, especially given the stipulation's five-year record and the military more broadly.

## I. Muslims and other religious minorities are required by their faith to maintain a beard.

OS1 Shoyeb's belief that he has to grow a beard is "by no means idiosyncratic." *Holt v. Hobbs*, 574 U.S. 352, 362 (2015). As is true for many Muslims, Sikhs, and Orthodox Jews, OS1 Shoyeb considers his beard a key part of his religious practices.

As several courts have recognized, growing a beard is a religious command for many Muslim men. In *Holt*, the Supreme Court protected a Muslim prisoner's right to grow a short beard, ruling that requiring a Muslim inmate "to shave his beard" would "seriously violate[]" his religious beliefs. *Id.* at 361. And in an opinion by then-Judge Alito, the Third Circuit ruled in favor of two Muslim police officers who were disciplined for refusing to shave their beards, relying on evidence that failing to grow a beard is a "major sin" as serious "as eating pork." *Fraternal Ord. of Police Newark Lodge No. 12 v. City of Newark*, 170 F.3d 359, 360 (3d Cir. 1999). For many Muslims, including OS1 Shoyeb, their beards need to be a fist's length, or roughly two to four inches long. ECF No. 22-1 at 5; *see Ali v. Stephens*, 822 F.3d 776, 780 (5th Cir. 2016). Many Muslim servicemen thus cannot serve under a quarter-inch beard limit without violating their faith.

Muslims are not the only religious group required to maintain hair for their faith. Some Native Americans believe their "hair is a gift from the Creator and is to be cut only when someone close to them dies." *Hamilton v. Schriro*, 74 F.3d 1545, 1547–48 (8th Cir. 1996). To some, "hair symbolizes and embodies the knowledge a person acquires during a lifetime" and cutting it costs them their "wisdom and strength" and can prevent them from "join[ing their] ancestors in the afterlife." *Warsoldier v.*

*Woodford*, 418 F.3d 989, 991–92 (9th Cir. 2005). Growing a beard is also an "established religious tradition among members of the Jewish faith." *Geller v. Sec'y of Def.*, 423 F. Supp. 16, 17 (D.D.C. 1976). The Sikh faith similarly "requires [its followers] to wear external articles of faith, including unshorn hair (kesh), a beard, and a turban." *Singh v. Carter*, 168 F. Supp. 3d 216, 220 (D.D.C. 2016) (cleaned up).

Defendants' renewed effort to stop OS1 Shoyeb from growing a beard penalizes him for religious practices that he shares with a host of Muslim, Sikh, and Jewish sailors. For these service members, the message is clear: to serve in the Navy, they must shed their religious identity and violate their faith.

## II. Forcing sailors like OS1 Shoyeb to choose between their faith and their country seriously burdens their ability to practice their faith.

Disadvantaging religious minorities clashes with RFRA, which Congress enacted to protect "religious minorities too small to be heard in the legislature"—or, as here, in the Navy. *The Religious Freedom Restoration Act: Hearing on S. 2969 Before the S. Comm. on the Judiciary*, 102d Cong. 77, 11 (1992) (statement of Douglas Laycock). Congress envisioned RFRA as "a general provision guaranteeing free exercise of religion" and granting "a right to argue for religious exemptions," *id.*, even in the military context. *Berger*, 56 F.4th at 92. Defendants' revocation of OS1 Shoyeb's religious accommodation flouts that statutory commitment. By forcing OS1 Shoyeb to choose between his duty to his country and his duty to his faith, Defendants will cause him great harm. Violating OS1 Shoyeb's religious freedom, whether for days or months, "unquestionably constitutes irreparable injury." *Roman Cath. Diocese of Brooklyn v. Cuomo*, 592 U.S. 14, 19 (2020) (per curiam) (quoting *Elrod v. Burns*, 427

U.S. 347, 373 (1976) (plurality opinion)). And "[i]t is too late in the day to doubt that the liberties of religion and expression may be infringed by the denial of or placing of conditions upon a benefit or privilege." *Trinity Lutheran Church of Columbia, Inc. v. Comer*, 582 U.S. 449, 463 (2017) (alteration in original) (quoting *Sherbert v. Verner*, 374 U.S. 398, 404 (1963)).

Here, the Navy's policy infringes OS1 Shoyeb's religious freedom by requiring him to violate his religious beliefs before he may accept an "assign[ment] for duty aboard a ship or in an operational environment." Joint Status Report ¶ 11, ECF No. 72. The resulting pressure on OS1 Shoyeb to forgo his religious practice "is unmistakable." *Sherbert*, 374 U.S. at 404. He must "choose between following the precepts of [his] religion and forfeiting [his new assignment], on the one hand, and abandoning one of the precepts of [his] religion in order to accept [the assignment], on the other hand." *Id.* By forcing OS1 Shoyeb to shave, the Navy is "subjecting him to the indignity of being unable to [fully] serve for reasons that . . . bear no relationship to [his] ability to perform." *Singh v. Berger*, 56 F.4th 88, 110 (D.C. Cir. 2022) (cleaned up).

And defendants have already stipulated that they would not force him to shave his beard. For the past five years, he has relied on the Defendants' stipulation and has donned protective masks dozens of times without issue. By taking away the accommodation that they previously granted him, they force him to choose between his faith and service and burden his ability to freely practice his faith.

## III. Accommodating religious minorities serves the Navy's interests.

By excluding religious minorities, the Navy undermines its own interests. For decades, Congress has recognized that "numerous religious traditions" are represented in the Armed Forces, "including Christian, Hindu, Jewish, Muslim, Sikh, . . . and many more." National Defense Authorization Act for Fiscal Year 2016, Pub. L. No. 114-92, § 528, 129 Stat. 726, 814; *Berger*, 56 F.4th at 108. The Navy recognizes that "religious expression" makes for "a better military and stronger nation." *Religious Accommodations*, My Navy HR, https://perma.cc/K8CF-56XL (last visited Sept. 30, 2026). The Navy has declared that accommodating sincerely held religious beliefs is "a pillar of the Navy's commitment to treating all Sailors with dignity and respect." *Id.* Accommodating religious practices allows the Navy to retain the broadest possible pool of qualified service members. Excluding otherwise qualified sailors because of their religious practices needlessly deprives the Navy of capable personnel.

Muslim service members have played a key role in the military, serving "as cultural and linguistic translators in the U.S. and abroad." Teresa Watanabe & Duke Helfand, *A Bridge Between Mosque and Military*, L.A. Times (Nov. 12, 2009), https://perma.cc/XY57-CGNM (noting one observer's account that the "services truly value the Muslim" community and "go[ ] out on a limb to bring them into the ranks"). The same is true of other religious minorities as well. *See Carter*, 168 F. Supp. 3d at 235 (granting a Sikh service member's religious accommodations and recognizing the

military's interest in recruiting individuals who "possess cultural and linguistic skills"). Excluding such service members would be a great loss.

Recognizing the immense value of including Muslim service members in its ranks, the military has long accommodated them. In the 1950s, the Department of Defense agreed to allow dog tags to identify Muslim service members so they could receive proper burial rites. Edward E. Curtis IV, Muslim Americans in the Military: Centuries of Service 33–34 (2016). Today, the Defense Logistics Agency provides halal-certified meals for service members who require it. Def. Logistics Agency, *Meal, Religious, Kosher/Halal,* https://perma.cc/L954-USTQ (last visited Sept. 30, 2026). Commanders have a variety of means to accommodate Muslim soldiers' observance of Ramadan. David Deppmeier, *Ramadan and Religious Accommodation for Soldiers*, U.S. Army, (June 20, 2013), https://perma.cc/Y4RG-GEA8. Colonel Khallid Shabazz explained that accommodations to practice Islam "made [him] a better Soldier" and inspired him to become a chaplain. *Id.* And since 2020, the Navy has adopted procedures for sailors to request accommodations for religious beards. Dep't of the Navy, *BUPERSINST 1730.11A, Standards & Procs. Governing the Accommodation of Religious Pracs.* ¶ 5(d)(4)(a) (Mar. 16, 2020); *see Berger*, 56 F.4th at 104.

Accommodating religious practices fosters "spiritual readiness," which—in the Navy's words—is "the capacity for mission accomplishment that results from the warfighter's connection to the transcendent." Dep't of the Navy, *OPNAVINST 1730.1F*, Religious Ministry in the Navy ¶ 4(e)(2)(a) (Nov. 9, 2022). And for OS1 Shoyeb, maintaining his beard is precisely the kind of connection to the divine the

Navy counts as an element of spiritual readiness. *See* ECF No. 22-1 at 4–5. Spiritual readiness fosters psychological well-being, physical health, and a sense of meaning and purpose. Harold G. Koenig, *"Spiritual Readiness" in the U.S. Military*, 62 J. Religion & Health 1561, 1567–69 (2023). It is also linked to lower rates of depression, substance abuse, PTSD, and suicide—risks that often plague service members. *Id.*

In sum, by requiring OS1 Shoyeb and other religious minorities to give up a core part of their faith and identity to serve, the Navy stifles religious expression and sidelines the very service members it needs most, to the detriment of service members health and mission readiness.

## IV. The Court should not credit generalized safety assertions as grounds for abandoning the stipulation.

### A. Courts must scrutinize, not blindly defer to, the military's asserted interests.

The Navy can justify its severe intrusion on OS1 Shoyeb's religious exercise only by satisfying an "exceptionally demanding" strict-scrutiny standard. *Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682, 728 (2014). This standard requires the government to show "that it lacks other means of achieving its desired goal without imposing a substantial burden on the exercise of religion." *Id.* And "[i]f a less restrictive means is available for the Government to achieve its goals, the Government must use it." *Holt,* 574 U.S. at 365 (cleaned up). This "demanding" standard "undoubtedly applies" even "in the military context." *Berger*, 56 F.4th at 92 (cleaned up).

The stringent strict-scrutiny standard requires courts not simply to "defer[]" to government officials' "mere say-so" but instead conduct a searching inquiry of the

government's alleged interests. *Holt*, 574 U.S. at 369. Courts must look "beyond broadly formulated interests" and "scrutinize[] the asserted harm of granting specific exemptions to particular religious claimants." *Gonzales v. O Centro Espírita Beneficente União do Vegetal*, 546 U.S. 418, 431 (2006); *see also Fulton v. City of Philadelphia*, 593 U.S. 522, 541 (2021). As a consequence, the Navy cannot restrict service members' religious exercise by simply gesturing to generalized concerns about national security or safety. *Ramirez v. Collier*, 595 U.S. 411, 430 (2022) (holding that "conjecture" about a hypothetical security risk was insufficient to justify a restriction on religious exercise); *Carter*, 168 F.Supp.3d at 232. Having agreed that OS1 Shoyeb could maintain his beard, Defendants cannot now justify reversing course without evidence that OS1 Shoyeb's beard presents a serious safety concern, especially when OS1 Shoyeb has successfully maintained a beard without issue for five years.

To be sure, some cases instruct courts to show "deference to . . . military authorities." *Goldman v. Weinberger*, 475 U.S. 503, 507 (1986). But that is not a blind deference, "the government still must provide 'persuasive reasons'" for rejecting alternatives or accommodating religious practices. *Berger*, 56 F4th at 104 (cleaned up). RFRA commands as much. Courts must scrutinize military policies to ensure service members' religious exercises are not burdened by military rules "based upon speculation, exaggerated fears or thoughtless policies." H.R. Rep. No. 103-88, at 8 (1993).

A judge in this district faithfully applied these principles and closely scrutinized the military's policies under RFRA. In *Carter*, Judge Howell granted a Sikh Army

Captain injunctive relief against the Army, after it sought to force him to undergo expensive, specialized testing to determine if his dastaar (turban) and beard would interfere with his combat helmet and mask. 168 F. Supp. 3d at 218–19, 236. The judge concluded that although the military is ordinarily entitled to "great deference" in matters of "military interest", *id.* at 219 (quoting *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008)), the specialized testing was "unfair and discriminatory" and improperly burdened his religious exercise. *Id.* at 230. The burden on OS1 Shoyeb here is even greater; he is being asked not just to undergo special testing but to entirely forgo his assignment purely because of his religious exercise—even though his beard has never prevented him from successfully donning a protective gas or firefighting masks. *See* ECF No. 81-3 ¶¶ 6–17 (Shoyeb Declaration).

By passing RFRA, Congress "placed a thumb on the scale in favor of protecting religious exercise." *Singh v. McHugh*, 185 F. Supp. 3d 201, 222 (D.D.C. 2016). The military cannot meet its burden under RFRA here.

### B. History and experience show that beards longer than a quarter inch are compatible with naval service.

Any rationale offered by the military must also withstand the scrutiny of history and experience. *See Ramirez*, 595 U.S. at 445 (Kavanaugh, J., concurring) ("[E]xperience matters in assessing whether less restrictive alternatives could still satisfy the State's compelling interest."). Likewise, "the policies followed at other well-run institutions" are helpful to determine whether a given restriction is necessary. *Holt*, 574 U.S. at 368–69 (cleaned up).

Defendants' safety concerns crumble under such scrutiny. For most of its history, the Navy has permitted sailors to keep beards. Sailors could wear beards of any length until 1841, when the Navy required that facial hair be "neatly trimmed." U.S. Naval Inst. Staff, *A Brief History of Grooming in the U.S. Navy*, USNI News (Oct. 23, 2014), https://perma.cc/66WG-TCSE. But the Navy also granted exceptions for longer beards, such as sailors deployed to cold climates or submariners with limited access to fresh water. *Id.* And when the Navy banned beards in 1984, its leadership explained the change was not a matter of safety, but of appearance because beards made the Navy look "extremely un-uniform." *Id.*; Alison Bath, *Let It Grow: Sailors, Marines Disgruntled by Beard Ban Find Favorable Reception to Challenges*, Stars & Stripes (Jan. 27, 2023), https://perma.cc/6PZ5-YRCA; *see also* Joshua C. McDaniel, *Courts and Commanders: Regulating Religious Freedom in the Military* 48 Cardozo L. Rev. *51 (forthcoming 2027) (detailing additional historical evidence). *Cf. Berger*, 56 F.4th at 106 (finding that since the Marine Corps' beard policy only dated back a few "decades" raised some "least-restrictive-means question marks").

Modern practice tells the same story. A former Navy officer has attested that on deployed cruisers and submarines, sailors can wear beards so long as they pay a small fee to the Morale, Welfare, and Recreation fund, making it "more common for sailors to be bearded than to be clean-shaven." Decl. of Graham Miller at 2, ECF No. 16-7 *Toor v. Berger*, No. 1:22-cv-01004-RJL, (D.D.C. Apr. 13, 2022). The same former officer likewise attested that NATO allies, including Germany, Hungary, and the United Kingdom, permit beards as a matter of standard practice without any effect

on professionalism or mission readiness. *Id.* at 3. And the Navy continues to permit medical beards, ECF No. 81-1 at 14, an exception that makes its asserted need for clean-shaven sailors "substantially underinclusive." *Holt*, 574 U.S. at 367; *see Berger*, 56 F.4th at 99–100.

Beyond the Navy's historical tradition of beard use, OS1 Shoyeb's stipulation in this very case undermines the Navy's argument. Courts have rejected military justifications contradicted by a service member's own record. *See e.g., Geller*, 423 F. Supp. at 18 (holding safety concerns were "not sufficient" because the plaintiff had been "permitted to wear a beard without criticism, adverse action or ill effects for seven years."). OS1 Shoyeb has served for five years with his religious beard under the stipulation, including a year of sea duty during which he donned firefighting and protective masks dozens of times without ever failing to achieve a seal or encountering other problems. ECF No. 81-1 at 4, 14. Another plaintiff likewise served four years at sea with his religious beard, donning firefighting masks without difficulty. *Id.* at 14. And in the years the Navy has spent studying the effects of facial hair on mask function, it has not had to make OS1 Shoyeb or any other beard-wearing service members shave for the sake of safety. *Id.* On this record, generalized safety concerns cannot justify abandoning the stipulation and forcing OS1 Shoyeb to choose between his faith and his service at sea.

## CONCLUSION

The Court should grant OS1 Shoyeb's motion to enforce the stipulation. Beards are an important component of many Navy sailors' religious practices. Defendants'

generalized safety concerns cannot justify forcing a devout Muslim sailor to abandon the religious beard the Navy previously agreed he could keep until this case is resolved.[2]

Respectfully submitted,

/S/ *Joshua C. McDaniel*
JOSHUA C. MCDANIEL
Harvard Law School
Religious Freedom Clinic
6 Everett Street, Suite 5110
Cambridge, MA 02138
(617) 496-4383
jmcdaniel@law.harvard.edu

*Counsel for Amici Curiae*

[2] Amici thank Monroe Harless and Susannah Cray, students in the Harvard Law School Religious Freedom Clinic, for helping to prepare this brief.

## CERTIFICATE OF COMPLIANCE

This brief complies with LCvR 7(o) and Fed. R. App. P. 29(a)(4) including all formatting requirements and is no more than 25 pages. This brief also complies with LCvR 5.1(d) because it has been typed in 12-point font and is double spaced.

Dated: October 23, 2026

*/s/ Joshua C. McDaniel*
Joshua C. McDaniel